GREAT AMERICAN INDEMNITY CO.
et al., Plaintiffs,

v.

Theodore BRITTON, Deputy Commission-
er, Bureau of Employees Compensa-
tion, et al., Defendants.

Civ. A. No. 3294-59.

United States District Court
District of Columbia.

Sept. 20, 1960.

Paul J. Sedgwick, Washington, D. C., for plaintiffs.

Oliver Gasch, U. S. Atty., John F. Doyle, Asst. U. S. Atty., and Herbert P. Miller, Asst. Solicitor, U. S. Dept. of Labor, Washington, D. C., for the defendant Britton.

Mario S. Romero, Washington, D. C., for defendants Fisher and Mainer.

HOLTZOFF, District Judge.

This is an action to review and set aside two awards under the Longshoremen's and Harbor Workers' Compensation Act, which constitutes the Workmen's Compensation Act for the District of Columbia.[1] The suit is brought by the insurance carrier and the employer, against the Deputy Commissioner of the Bureau of Employees Compensation and against the claimants to whom benefits had been awarded by him because of the death of two employees involved in this proceeding. The matter is now before the Court on a motion of the defendant Deputy Commissioner, for summary judgment.

The case is unusual. Were it not profoundly tragic it could be said to be bizarre. Bernard J. Mainer and Kenneth M. Fisher were musicians performing at a restaurant in downtown Washington, known as The Jo-Del Restaurant. On the night of December 27, 1957, two intoxicated and disorderly patrons were ejected from the establishment. Later that night, after the musical entertainment had been completed, the musicians had been paid off, and the place was about to be closed, the two disgruntled customers returned, carrying firearms and commenced shooting inside the restaurant. They first shot one of the proprietors, who died instantly. Continued indiscriminate gunfire on their part re-

sulted in the wounding of the two musicians. These wounds proved fatal. The Deputy Commissioner, after a series of protracted hearings, awarded compensation to Mainer's mother, and to Fisher's widow and children. The plaintiffs claim that no awards should have been made and seek to set them aside.

It is appalling to contemplate that such an uncivilized and barbaric episode could take place in the heart of this city in the middle of the Twentieth Century. The case has a strong humanitarian and sympathetic appeal especially as to Fisher's widow and children. On the other hand, one may well wonder whether it is within the philosophy of the Workmen's Compensation system that such a tragic event as occurred in this case should be within the insurance coverage, and whether it was contemplated that an employer should carry and pay for insurance against such remote and rare contingencies. One may reasonably question whether these murders may properly be regarded as an industrial accident. These enquiries, however, need not be pursued by this Court in the instant case, for the attack on the awards of the Deputy Commissioner is directed solely against his findings of fact, which, it is contended, are not supported by substantial evidence.

The principles governing judicial review in workmen's compensation cases are well established. They are so fundamental that they can be briefly and succinctly recapitulated without citation of authorities. The statute must be liberally construed and applied in favor of the workman. The scope of judicial review is strictly limited. The statutory action[2] to set aside an award of compensation does not contemplate a trial de novo, but merely a judicial review of administrative action on the administrative record. The only questions that the Court may consider are, first, whether the award is contrary to law; and second, whether the administrative findings

1. 33 U.S.C.A. 901 et seq.; D.C.Code [1951 Ed.] 36-501.

2. 33 U.S.C.A. § 921(b).

of fact are supported by substantial evidence. While substantial evidence means more than a scintilla of evidence, nevertheless the Court may not consider the weight of evidence, but is limited to determining merely whether there is substantial evidence in the record sustaining the findings of fact.[3] That countervailing evidence may have more probative value would not warrant the court in overruling the findings. So, too, the Court may not set aside the inferences drawn by the Administrator from the evidence that he chose to believe, if such inferences are reasonably possible and have a rational basis. Again, the Court may not review the credibility of witnesses, even if the record shows that the veracity of a witness has been impeached. Due regard must be accorded to the fact that the Court has only the cold, printed record before it, while the trier of the facts had the advantage of seeing and observing the witnesses. The Court may not substitute its own judgment for that of the Deputy Commissioner. Its function in these cases is no broader than that of the Court of Appeals in reviewing a judgment of the District Court. Thus it is clear that the scope of judicial review in these cases is narrow and restricted.

In the amended complaint and in oral argument of counsel, the following objections against the Deputy Commissioner's findings of fact were advanced.

1. That the injuries were not sustained by the deceased in the course of employment, since the latter had completed their work and had been paid off about one-half hour before the shooting, but remained on the premises for their own purposes.

2. That there was no employer and employee relationship between the owner of the restaurant and the musicians, but that the latter were independent contractors.

3. That there is no substantial evidence sustaining the finding of the Deputy Commissioner as to the wage rate of the deceased.

4. That there is no substantial evidence sustaining the finding that Mainer's mother was dependent on him.

For the reasons about to be stated, the Court will overrule objections 2, 3, and 4, and sustain objection No. 1.

■ The hearings before the Deputy Commissioner were unduly protracted and the record is unnecessarily voluminous due to the persistence of counsel in insisting on tendering much immaterial, irrelevant and incompetent matter. A close and intensive reading of the transcript of the evidence was required on the part of the Court in order to winnow the wheat from the chaff. The Deputy Commissioner made full and detailed findings of fact with painstaking care. The Court at this point will discuss the second, third and fourth objections, leaving the first objection until the last. The second objection was that no employer-employee relationship existed between the musicians and the owner of the restaurant, but that the musicians were independent contractors. The proof on this issue was conflicting. There was evidence, however, that each of the three musicians, who played or sang in the restaurant, was separately hired by the proprietor; that the owner exercised the function of hiring and discharging them; that each was individually paid by the proprietor a salary of $10 a night; and that each was required to perform during regular working hours set by the proprietor. The Deputy Commissioner was justified on the basis of this evidence in finding that the musicians were employees of the restaurant. It was shown,

---

3. At times it is said that there must be substantial evidence on the record "as a whole". The phrase "as a whole" is, however, tautological and superfluous, since manifestly the Court must consider the record as a whole in order to determine whether it contains substantial evidence supporting disputed findings of fact.

on the other hand, that no deductions were made from the musicians' compensation for Social Security and income taxes, and further, that no premium for workmen's compensation insurance was paid in regard to them. Whether the Social Security Act and the withholding provisions are applicable involves different questions. That no insurance premiums were paid is a circumstance as compatible with the conclusion that the employer failed to comply with the law as it is with the contention that the musicians were independent contractors.

■ The evidence does indeed indicate that the musicians were in a sense temporary employees, as they and other similar workers in the entertainment field were in the habit of frequently changing their place of employment, sometimes every few months, sometimes every few weeks, and even every few days. No doubt this circumstance increases the employer's problem and burden in keeping appropriate records. Neither the Longshoremen's and Harbor Workers' Compensation Act nor the local statute making the Federal Act generally applicable in the District of Columbia, however, contains any provision excluding temporary or floating employees from the benefits of the insurance scheme. The District of Columbia law excepts any "employee engaged in * * * any employment that is casual *and* [4] not in the usual course of the trade, business, occupation, or profession of the employer", D.C.Code [1951 Ed.] 36–502. Manifestly this provision is not applicable to the case at bar since music was furnished in the restaurant in the usual course of the employer's business.

■ The third objection is that there was no substantial evidence sustaining the finding of the Deputy Commissioner that the earnings of the deceased averaged $65 a week. There is ample evidence, however, that each of the two musicians at the time of his death was receiving wages of $10 a day, for a five day week; that in addition he earned tips ranging from $3 to $6, or more, a day; and that previously he had earned $12 a day for a seven day week. Accordingly the Court is of the opinion that this finding of the Deputy Commissioner is sustained by substantial evidence.

■ The fourth objection is that there was no substantial evidence sustaining the finding that Mainer's mother was dependent on him. The evidence on this point is far from satisfactory. Much of it is indefinite, general, and hazy. Some of it is contradicted. Moreover, the testimony of Mainer's mother was seriously impeached on cross-examination. On the other hand, several witnesses corroborated her statement. Whether this testimony should be believed or rejected, whether so much of it as is favorable to the claimant should be credited and what weight should be attached to it, are questions for the trier of the facts and not for a reviewing tribunal. The fact remains that there is some testimony of substance, which, if believed, would tend to indicate that the deceased had been making considerable contributions to his mother which were of no mean assistance to her in her support.

■ We shall now revert to the first objection, namely, that there was no substantial evidence justifying the findings that the deceased were murdered in the course of their employment. The learned Deputy Commissioner made the following findings in respect to employee Mainer:

"That on the said day the employee herein while performing services for the employer as a musician, sustained personal injury when he was shot by gunmen, suffering wounds of the back, abdomen, right leg, right buttock, rupture of the spleen, contusion of the left kidney, tear of the posterior wall of the stomach, and damage to the spinal cord followed by paraplegia.

4. Emphasis supplied.

\* \* \* \* \* \*

"That on December 27, 1957, the employee and the other musicians, after entertaining the employer's guests, finished their work sometime between 1:30 and 2:00 a. m. and, as was the established custom, went to the bar where they regularly divided the money received from the guests as tips and where they were paid their wages; that, while waiting to receive their wages, the employee sustained injury as found above."

"That the injury arose out of and in the course of the employment."

Similar findings were made in respect to employee Fisher.

The evidence on this point is scanty. There were three musicians performing at the restaurant on the night in question. The third was Sherwood, who testified as follows (Tr. 551, 552, 553, 554, 555 and 556):

"Q. You started out at 9:00 o'clock on Thursday night, and the shooting was at 2:00 o'clock or shortly thereafter on Friday morning? A. Yes.

"Q. That is what I am trying to determine. Now, were you paid for that night's stand in cash at about 1:30? A. (Nodding affirmatively.)

"The Deputy Commissioner: The answer is 'yes'.

"The Witness: Yes.

"By Mr. Sedgwick. Q. Now, were you paid in cash? A. Yes.

\* \* \* \* \* \*

"Q. Did you see Fisher paid $10.-00 that night? A. Yes, sir.

\* \* \* \* \* \*

"Q. Now, also talking about this 1:30 in the morning when you finished your playing, who paid B. J. his $10.00? A. Mr. Kaldes.

\* \* \* \* \* \*

"Q. Now, at the time—what was the closing hour of the restaurant? I mean, when they would lock the front door? 2:00 o'clock? A. 2:00 o'clock, yes.

\* \* \* \* \* \*

"Q. Now, at 1:30 when you stopped the music and—at what time was it that the fight first commenced to start when you thought there might be a little trouble? A. About 1:00 o'clock.

\* \* \* \* \* \*

"Q. How long after you all had stopped playing was it that Overton and Carpenter went out? A. We didn't stop playing until 1:30, and they was fighting around 1:00 o'clock.

\* \* \* \* \* \*

"Q. But I mean, they left then, didn't they, before they came back with guns? A. Yes.

"Q. What I am trying to find out is *how long after you stopped playing music was it that they left to get guns, or for whatever reason?* [5] A. *About half an hour.*

"Q. That would be approximately 2:00 o'clock? A. Yes.

"Q. Then George Kaldes locked the place at 2:00 o'clock? A. He started to, yes.

"Q. That is when they came back? Shortly after that they came back in with guns? A. Yes.

"Q. Actually, George Kaldes had closed up for the night but had failed to lock the door, wasn't that what happened? A. Yes, sir.

"Q. How long after 2:00 o'clock would you say it was before the two men came back with guns? A. About a minute after 2:00.

"Q. And at that time where were you? A. I was standing at the bar with B. J.

"Q. And was B. J. at the bar also? A. Yes.

"Q. Was Fisher at the bar also? A. No, he left and started walking down to the band stand.

5. Emphasis supplied.

944

"Q. Had he been at the bar before that? A. Oh, yes.

"Q. Now, when they came in, the two armed men, what did you do? A. I moved behind the bar as soon as I seen the gun that the man Overton had.

\* \* \* \* \* \*

"Q. Now, at the time that B. J. was shot where was he? A. Right in front on the other side of the bar.

"Q. He was on the customers' side of the bar? A. Yes, sitting on a stool.

"Q. How many stools can the bar accommodate? A. Oh, about ten.

"Q. And prior to the time that you say Fisher had started to walk somewhere, was he also on a stool? A. When they came in?

"Q. Yes. A. No, he had just got off the stool and started walking.

"Q. Had Fisher also been on one of the stools alongside of B. J.? A. Yes.

"Q. And we are talking about the stools on the customer side as distinguished from where you were? A. I was there too, and when they came in, Kenny had already started walking down to the bandstand, and when they came in I just walked around behind B. J. and stood at the end of the bar."

■■■ The foregoing testimony stands uncontradicted and seems unequivocally to lead to the conclusion that the two deceased musicians had completed their performance about 1:30 a. m., and were immediately paid off; that they sat around in the restaurant for their own personal purposes instead of immediately leaving their place of employment; and that the murderers came in about 2:00 a. m., and commenced shooting. Clearly, therefore, when they were shot, the deceased were not on the premises in the course of their employment. Their duties had terminated a half hour previously and they had been free to depart.

Under the circumstances, the Court is constrained to conclude that the finding of the Deputy Commissioner that the deceased were shot while they were being paid their wages, is not supported by substantial evidence. Similarly, the conclusion that the injuries were sustained in the course of employment likewise does not seem justified. On the contrary, under the circumstances the Court is of the opinion that the injuries were not sustained in the course of employment. In view of these considerations, there is no liability to pay workmen's compensation in these cases. This view is fully supported by the weight of authority. It is well established that while an employee must have reasonable time within which to leave the employer's premises after his duties are finished for the day, nevertheless, if for his own purposes he tarries for some time after working hours, he is no longer in employment status under the Workmen's Compensation Act and any injury sustained during that period is not compensable. Thus in National Biscuit Co. v. Litzky, 6 Cir., 22 F.2d 939, 56 A.L.R. 853, it was held that injuries sustained by the employee while she lingered on the employer's premises after her work was terminated, in order to have lunch, were not covered by the Workmen's Compensation Act.

In Congdon v. Klett Co., 307 N.Y. 218, 120 N.E.2d 796, the same principle was applied in the case of an employee who had completed his day's duties but remained on the employer's premises in order to take a swim in the employer's pool with the employer's permission. In this instance the hours of work ended at 5:00 p. m., and the injury was sustained about 5:30 p. m.

In Urban v. Topping Brothers, 184 App.Div. 633, 172 N.Y.S. 432, a clerk in a wholesale concern finished his work and went to look for companions with whom he usually went home and who were at that time elsewhere in the employer's premises. While doing so, he was injured. The Court held that at the time of the injury he was no longer engaged

in the business of his employment and, consequently, his death, which resulted from the injury, was not compensable under the Workmen's Compensation Act.

In Adams v. Uvalde Asphalt Paving Co., 205 App.Div. 784, 200 N.Y.S. 886, the employee was laid off but remained in the employer's premises to eat lunch. After lunch but before leaving the premises he was injured. It was held that he was not in the course of his employment when he was hurt and that an award under the Workmen's Compensation law could not be sustained.

In Fowler v. Texas Employers' Ins. Ass'n, Tex.Civ.App., 237 S.W.2d 373, the plantiff was a saleslady in a large department store working only part time. On the day of the accident her work ended at 3:00 p. m. Instead of leaving the store, however, she went to another department to purchase some articles for herself. This activity consumed about fifteen or twenty minutes. Then while she was preparing to leave, she was injured. It was held that there could be no recovery under the Workmen's Compensation Act, because the injury was incurred after the termination of the employment for the day and subsequently to the time that would have been reasonably consumed in leaving the store.

It follows hence that the plaintiffs are entitled to summary judgment. While the plaintiffs have not filed any document entitled a motion or a cross-motion for summary judgment, the Court will treat the plaintiffs' written opposition to the defendants' motion, as a cross-motion. To do otherwise would unduly stress mere technicalities and create futile circumlocution.[6]

The defendants' motion for summary judgment is denied. The plaintiffs' motion for summary judgment is granted.

6. American Auto Ins. Co. v. Indemnity Ins. Co., D.C.E.D.Pa., 108 F.Supp. 221, 224; Farmers' Insurance Exchange v. Allstate Ins. Co., D.C.E.D.Mich., 143 F.

Supp. 213, 215; United States v. Cless, D.C., 150 F.Supp. 687, 692, affirmed 3 Cir., 254 F.2d 590.