Grace VETTER, Appellant,

v.

ALASKA WORKMEN'S COMPENSATION BOARD and Sue Wagner, dba Polaris Lunch, Appellees.

No. 1943.

Supreme Court of Alaska.

July 12, 1974.

Joseph W. Sheehan of Rice, Hoppner, Blair & Associates, Fairbanks, for appellant.

Thomas E. Fenton of Call, Haycraft & Fenton, Fairbanks, for appellees.

Before RABINOWITZ, C. J., and CONNOR, ERWIN, BOOCHEVER and FITZGERALD, JJ.

## OPINION

ERWIN, Justice.

This appeal arises from an Alaska Workmen's Compensation Board decision which denied appellant Grace Vetter's claim for disability compensation.

Grace Vetter was employed in Sue Wagner's restaurant, the Polaris Lunch, located in Fairbanks, Alaska. On April 24, 1970, while acting within the scope of her employment, she was injured when a customer physically attacked her. Sue, who did not carry workmen's compensation insurance at the time, agreed to pay for any medical expenses incurred by Grace as a result of her injuries. Sue paid at least some of the bills, maintaining that she paid all that were presented to her. Grace then filed a claim with the Alaska Workmen's Compensation Board, in which she requested both medical costs and a disability award. Sue denied the claim.

After a hearing in May, 1972, the Board awarded Grace $947.20 to cover medical expenses incurred through the date of hearing, but dismissed the claim for disability compensation. The denial was affirmed by the superior court, which granted summary judgment in favor of Sue.

The appeal from this judgment centers about the denial of disability compensation. Appellant contends that: (1) the Board's failure to award compensation was based on an incorrect legal premise, more specifically, that it had considered matters inappropriate to a workmen's compensation proceeding; and (2) the Board's decision to deny disability compensation was not supported by substantial evidence.

The proper scope of review for this court is outlined in Great American Indemnity Co. v. Britton:

> The only questions that the Court may consider are, first, whether the award is contrary to law; and second, whether the administrative findings of fact are supported by substantial evidence.[1]

### Was The Board's Decision Contrary To Law?

The dispute upon appeal centers primarily about the Board's third finding of fact, which appears to be the basis for the Board's dismissal of Grace Vetter's claim for disability compensation. The Board found:

> That the applicant did not suffer disability from work as a result of injury on April 24, 1970. She was able to continue working for the remaining five to six hours of her shift and did not find need to see the doctor until the afternoon of a [sic] day when she was hurt at 2 a. m. The Board believes that applicant does not want to work and that her husband, who did not want her to work before the injury, probably keeps her from working now. We believe the fact that she gives a previous earning history of minimal employment during the three years previous to injury is indicative of this.

This finding is followed by the dismissal of the claim for compensation for disability.

 Appellant's claim could not be dismissed merely because she did not go immediately to a doctor.[2] However, the

---

1. 186 F.Supp. 938, 940–941 (D.D.C.1960), rev'd on other grounds, 110 U.S.App.D.C. 190, 290 F.2d 381 (1961), cert. denied, 368 U.S. 900, 82 S.Ct. 178, 7 L.Ed.2d 95 (1961).

This standard of review was adopted by this court in Morrison-Knudsen Co. v. Vereen, 414 P.2d 536, 543 (Alaska 1966), and followed in Beauchamp v. Employers Liab. Assurance Corp., 477 P.2d 993, 997 (Alaska 1970), and in Wilson v. Erickson, 477 P.2d 998, 999 (Alaska 1970).

2. See Alaska State Housing Authority v. Sullivan, 518 P.2d 759 (Alaska 1974). Compare Morrison-Knudsen Co. v. Vereen, 414 P.2d 536, 541 (Alaska 1966), where the fact that claimant did not know immediately of his disability and only acquired knowledge of it later when his back problems flared up was held to be unimportant as affecting the timeliness of his claim.

As there are many medical problems where the extent and duration of the symptoms

second portion of the finding introduced another ground for dismissal. The Board found that Grace Vetter did not want to work and supported this finding by reference to her husband's attitude toward her employment [3] and her previous sporadic working history.[4] A dismissal for this reason has a proper foundation in the law. The concept of disability compensation rests on the premise that the primary consideration is not medical impairment as such, but rather loss of earning capacity related to that impairment. An award for compensation must be supported by a finding that the claimant suffered a compensable disability or, more precisely, a decrease in earning capacity due to a work-connected injury or illness.[5] Factors to be considered in making this finding include not only the extent of the injury, but also age, education, employment available in the area for persons with the capabilities in question, and intentions as to employment in the future.[6] The aim is to make the best possible estimate of future impairment of earnings considering any available clues:

> . . . the purpose of the wage calculation is not to arrive at some theoretical concept of loss of earning capacity; rather it is to make a realistic judgment on what the claimant's future loss is in the light of all the factors that are known.[7]

■ If a claimant, through voluntary conduct unconnected with his injury, takes himself out of the labor market, there is no compensable disability. If an employee, after injury, resumes employment and is fired for misconduct, his impairment playing no part in the discharge, there is no compensable disability.[8] Total disability benefits have been denied when a partially

are not known at the outset, a denial of compensation merely because the claimant does not visit a doctor for several hours following injury would only thwart the beneficent purposes of the Alaska Workmen's Compensation Act.

3. Appellant argues that the Board's consideration of Mr. Vetter's desires and concern for his tax bracket constituted error on the theory that they are not pertinent to the question of Grace Vetter's disability. This would indeed present a serious problem if the Board merely looked at Mr. Vetter's income and his desires concerning his wife's employment and denied compensation on that basis, regardless of her intent. However, this does not appear to be what the Board did in this case. Rather, they found that she did not want to work. Her husband's feelings are relevant in a determination of what her desires might be.

4. Grace Vetter's work history generally consisted of jobs of short duration. Following the Vetters' move to Fairbanks in 1951 or 1952, Grace was employed as a bartender at a small restaurant. She testified that she worked at this job "for about a year." Between 1952 and late 1955 or early 1956, she worked at two local cafes, each for a period of several months. Around 1956 she went to Australia for a year to have an operation for the removal of a kidney. Shortly after she returned to Alaska in 1957 or 1958, she went to work at the Model Cafe. She testified that she "worked on and off at the Model Cafe for years," working three, four, five or six months at a time:

> It depends, you know. I mean if I felt as though I wanted to work or liked to work, or if I didn't have something else to do, I'd explain it to Steve [the owner of the cafe] and it was all right with him, and I could always go back.

It is unclear how long this arrangement lasted, but Grace took out a withdrawal card from her union in 1964 and apparently did not work in 1966. In 1967 she worked for "a month or six weeks" at the Sullivan Hotel in order "to help [the owner] out." She was unemployed in 1968. In 1969 she worked for the International Coffee Shop at the Fairbanks airport. Grace testified that she went to work for Sue Wagner at the Polaris Restaurant in February, 1970, and worked there approximately ten weeks before she was injured. Sue Wagner testified, however, that Grace had worked only seven days in the two-week period preceding her injury.

5. Manthey v. Collier, 367 P.2d 884, 888–889 (Alaska 1962); 2 A. Larson, The Law of Workmen's Compensation § 57.10, at 7–8 (1970).

6. J. B. Warrack Co. v. Roan, 418 P.2d 986, 987 (Alaska 1966); Argonaut Ins. Co. v. Indus. Accident Comm'n, 57 Cal.2d 589, 21 Cal.Rptr. 545, 371 P.2d 281, 284 (1962).

7. 2 A. Larson, The Law of Workmen's Compensation § 60.21, at 88.200 (1970).

8. Id. at § 57.64, at 88.26.

disabled claimant has made no bona fide effort to obtain suitable work when such work is available.[9] And, a claimant has been held not entitled to temporary total disability benefits even though she had a compensable injury when she had terminated her employment because of pregnancy and thereafter underwent surgery for the injury. Since the compensable injury was not the reason she was no longer working, temporary disability benefits for current wage losses were denied.[10]

The Board in the instant case determined that Grace Vetter was no longer employed, not because of any injury but because of her own personal desires, and found no actual impairment of her earning capacity. If this determination is supported by substantial evidence, the claim for compensation was correctly denied.

## Was The Board's Finding Supported By Substantial Evidence? [11]

■ Appellant sets forth numerous references to the record indicating the extent of her original injuries and the ongoing nature of her symptoms. But, as discussed above, the extent of her disability is not of consequence if it is determined that she had no intention of re-entering the labor market for reasons unconnected with her injuries.

■ Upon reviewing the entire record we find no substantial evidence supporting the Board's finding that Grace was unwilling to find suitable employment, either because her husband was opposed to her working or because she did not desire to work. Indeed, almost all the evidence is to the contrary. Her husband's feelings were explored only indirectly.[12] At several points Grace testified that her husband had expressed a preference that she not work, primarily because the additional income placed them in a higher tax bracket, but nowhere is there any testimony that Grace's husband was opposed to her working [13] and the answer to the only direct question on this issue was that he did not care. On the issue of her desire

---

9. Perry's Heating Serv. v. Cashman, 104 R.I. 75, 241 A.2d 823, 826 (1968).

10. Electronic Associates, Inc. v. Heisinger, 111 N.J.Super. 15, 266 A.2d 601 (1970).

11. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Keiner v. City of Anchorage, 378 P.2d 406, 411 (Alaska 1963). The Board's decision need not be compelled under the facts as the only possible solution to the problem, as it is not the function of this court to reweigh the evidence but only to determine whether such evidence exists. Laborers & Hod Carriers, Local 341 v. Groothuis, 494 P.2d 808, 811–812 (Alaska 1972); Wilson v. Erickson, 477 P.2d 998, 1002 (Alaska 1970). It is not important whether the particular situation is subject to more than one inference, Anderson v. Employers Liab. Assurance Corp., 498 P.2d 288, 290 (Alaska 1972), as it is not the court's province to choose between competing inferences, Cook v. Alaska Workmen's Compensation Bd., 476 P.2d 29, 32 (Alaska 1970); Morrison-Knudsen Co. v. Vereen, 414 P.2d 536, 543 (Alaska 1966).

12. Grace Vetter's husband was not called as a witness at the hearing, nor was his deposition taken.

13. Q. Did your husband want you to work?
A He didn't care, really, except that he, you know, didn't care whether I worked or not, but he did make a statement that he wasn't particular, you know, if I had worked or not.
Q Didn't you say earlier this morning that he didn't want you to work because it threw him in a higher income tax bracket?
A He didn't want me to, well, I would, he didn't want me to work on account of this, you mean?
Q On account of . . .
A Oh, he had that in mind, yes.

 . . . . .

A . . . I had gone [to the Polaris Lunch] on several occasions, you know, to talk to Sue, and had coffee with her, and I knew most of the girls that worked there at that time, and I knew Sue had been having quite a bit of trouble over their help, and she had asked me to go to work, and one time my husband was with me, and he said "I don't particularly care for Grace to work." The fact remains, and it is a fact, that any income that I might receive would put him in a higher bracket. I can see his point now, but at the time he didn't particularly care for me to work.

 . . . . .

to work, Grace testified that she considered her job at the Polaris Lunch a permanent one and intended to continue working there as long as they would have her. And her employer, Sue Wagner, testified that she came in frequently following the attack asking if she could return to work.[14]

There is also considerable evidence in the record that Grace was unable to return to work due to complications resulting from her injury. While Grace did state that her main reason for not returning to work was that she wanted no more fights or arguments with anyone, she also testified that because of the headaches and kidney problems she suffered as a result of her injury, she had limited her activities in public.[15] She further testified that she had to decline an offer of a waitress job at another restaurant because she was physically unable to perform the work. Grace's physician for 15 years testified that it was his opinion that she was incapacitated as a result of her injury and was not malingering. No other medical testimony was presented.

In short, the focus of the hearing was not upon the defense that Grace was unwilling to work but rather upon the defense that her injuries resulted from a deliberate attack by her upon a customer. And whatever testimony reflected adversely upon her willingness to work was given incidentally in response to questions directed to this latter issue. Such testimony, even given its most favorable inference, does not support the· finding of her unwillingness to work.

Q And why were you given a check instead of cash?
A Well, I don't know really how· to answer that.
Q Well, was anything said?
A Well, in the first place my husband didn't particularly care for me to go to work, and I felt as though I was capable and able, you know, to work, and he felt as though that with my income that I would have put us in a higher bracket, and Sue was aware of this.

We thus find a lack of substantial evidence to support the finding of the Board that appellant Grace Vetter was unwilling to work and reverse the decision of the superior court affirming the Board's refusal to grant appellant disability compensation. We remand this case to the superior court with instructions to in turn remand the case to the Workmen's Compensation Board for further proceedings in conformity with this opinion.

CONNOR, Justice, with whom FITZGERALD, Justice, joins, dissenting.

My disagreement with the majority opinion stems not from any difference about the applicable principles but from a difference in interpreting the record.

The Board's finding of fact #3, upon which the denial of compensation is predicated, is as follows:

"That the applicant did not suffer disability from work as a result of injury on April 24, 1970. She was able to continue working for the remaining five to six hours of her shift and did not find need to see the doctor until the afternoon of a day when she was hurt at 2 a. m. The Board believes that applicant does not want to work and that her husband, who did not want her to work before the injury, probably keeps her from working now. We believe the fact that she gives a previous earning history of minimal employment during the three years previous to injury is indicative of this."

The Board found that Mrs. Vetter suffered no disability from work as a result

Q Well, is what you're saying then the cash was below the table or whatever you call it? Is that what you mean?
A Well, I was paid across the board, if that's the expression.

14. Sue Wagner also testified to the effect that Grace Vetter was a good worker who would be rehired any time.

15. As is pointed out in note 4 *supra*, Grace Vetter had already had one kidney removed before the attack.

of her injury. This can mean one of two things, or both, in the context of this case: she has *no ongoing symptoms* which are serious enough to prevent her from working, or, regardless of her condition, she does not care to work any longer. The sentence noting that Mrs. Vetter did not immediately seek out a doctor indicates the first, i. e., one can infer that the Board doubted the seriousness of her injury. A delay in seeking medical attention would not in itself be sufficient ground to deny compensation. However, there was other evidence which implied that Mrs. Vetter was capable of returning to work but had not sought to do so. At the hearing, she was asked whether she felt capable of returning to work:

"Q. How has it affected your daily living? I mean, do you feel you are capable of going back to work right today?

A. No.

Q. Why not?

A. In the first place, I just don't feel as though I'm capable, and could even be qualified to work in the public.

Q. Why do you say that?

A. Because it could happen again.

Q. When you say 'it could happen again', what could happen again?

A. I don't want any more arguments or to fight with nobody."

Mrs. Vetter also testified concerning a job solicitation, apparently instigated by Sue Wagner. She told the offeror that she was not looking for a waitress job, and when describing the interview with him, did not indicate that she did not want the job because of ill health.

A steady bingo player reported that she had seen Mrs. Vetter playing bingo, and said that she had seen Grace play about that same amount of cards that she did (12–15) *without any apparent confusion* and had seen her win. Sue Wagner re-ported that Mrs. Vetter came in several times following the incident asking to be put back to work. In her deposition, Mrs. Vetter said that she had traveled to Australia in September of 1970 (her injury took place in April of 1970) for three months because her mother was seriously ill.

The doctors' reports would tend to indicate the ongoing nature of her symptoms. Dr. Ribar did not think she was malingering and did not think her capable of returning to work. Dr. Hanns said that physical examination revealed no distress, but the symptoms she complained of were characteristic of the type of injury she had suffered. The initial kidney problem was reported to have cleared up.

There was other evidence which indicated that Grace was not able to return to work. She described frequent, severe headaches, and said that her condition had limited her activities; she was not able to play bingo nearly as often as she had before, and generally was not as "social" as she used to be. She also said she could watch only 3 or 4 bingo cards. Her companion bingo player could not report as to how often she had seen Grace playing bingo in the months preceding the hearing. Grace said in her deposition that Sue Wagner had asked her to return to work, not that she had asked Sue:

"A. Oh yes, on several occasions I would ask—well, when she'd ask me when I was coming back, and I said, 'I hope I can come back pretty soon.'"

She also said that she felt that she was not physically able to work.

There were indications that Grace was not a serious member of the labor market. Her doctor, Dr. Ribar, was aware of her work to only a vague extent. Sue Wagner described Grace as only a temporary hire. Grace, in her deposition, revealed no real clear-cut plans as to employment.

"Q. Well, how long were you planning to work for Sue? If you had any plans.

A. Well, now that answer I couldn't give you any answer to that, because I don't know.

Q. Well, you didn't have any—

A. You don't know what happens.

Q. Well, what I'm thinking about, it wasn't anything like working for her for three months and then quitting and going some place or doing something else, you didn't have that plan in mind?

A. Oh, no, I did not have, no, no way."

There were several references to the Vetters' tax bracket and her husband's desires concerning her work.

"A. . . . and one time my husband was with me, and he said 'I don't particularly care for Grace to work.' The fact remains, and it is a fact, that any income that I might receive would put him in a higher bracket. I can see his point now, but at the time he didn't particularly care for me to work."

And later at the hearing:

"Q. Did your husband want you to work?

A. He didn't care really, except that he, you know, didn't care whether I worked or not, but he did make a statement that he wasn't particular, you know, if I had worked or not.

Q. Didn't you say earlier this morning that he didn't want you to work because it threw him in a higher income tax bracket?

A. He didn't want me to, well, I would, he didn't want me to work on account of this, you mean?

Q. On account of . . .

A. Oh, he had that in mind, yes. Yes."

And in the deposition:

"A. Well, in the first place my husband didn't particularly care for me to go to work, and I felt as though I was capable and able, you know, to work, and he felt as though that with my income that I would have received would put us in a higher bracket, and Sue was aware of this."

If the Board was tending to doubt the seriousness of Mrs. Vetter's injuries, the refusal of the waitress job offer following the incident with Hill would tend to support the inference that she was not seriously interested in obtaining a job. This, of course, is buttressed by her sporadic working history and her indefinite attitude towards work.

On the other hand, at the hearing, Grace testified that she didn't regard working at the Polaris as temporary, and that she had always thought that she would eventually return to work at the Polaris. Sue Wagner also reported that she was not ready to fire Grace following the incident, but instead indicated that she just wanted things to calm down a bit before taking her back.

Much of Grace Vetter's testimony was contradicted by that of other persons, indicating that perhaps she was not as seriously injured as she maintained, and that she was not altogether serious about any work plans. Another matter which is essentially unrelated to the compensation issues but which does relate to her credibility concerns whether she knew Jay Hill before the incident in the cafe. She steadfastly maintained that she did not. However, a sister to Sue Wagner and Jay Hill both maintained that Grace knew her assailant previous to the brawl, as did Sue Wagner. And the Board also had the benefit of the claimant's demeanor during the hearing which lasted for several hours.

Admittedly the record in this case is not altogether enlightening. But I think there

was enough for the Board to infer that Mrs. Vetter did not desire to resume work. I would, therefore, uphold the Board's denial of the claim.