**Margarita ROBLES, Petitioner,**

v.

**PROVIDENCE HOSPITAL, Respondent.**

No. S–8543.

Supreme Court of Alaska.

Sept. 24, 1999.

Chancy Croft, Chancy Croft Law Office, Anchorage, for Petitioner.

Constance E. Livsey, Holmes Weddle & Barcott, Anchorage, for Respondent.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

CARPENETI, Justice.

## I. INTRODUCTION

Margarita Robles petitioned this court to vacate the superior court's second remand of her case to the Alaska Workers' Compensation Board. Because the Board properly interpreted and acted upon the original remand, we vacate the superior court's second remand order.

## II. FACTS AND PROCEEDINGS

### A. Factual Background

Margarita Robles is a 60–year–old former employee of Providence Hospital (Providence) in Anchorage. Robles ceased her education at the eighth grade. She began working at Providence in 1970 as a nurse's assistant. She was promoted after approximately twelve years to a sterile processing technician position, a job which she held until December 1992. At that time her physician, Dr. McGuire, determined that her knees were degenerating and that the job requirements had become too physically demanding for her.

Robles has suffered two separate knee injuries, one to each knee. The first was an on-the-job injury in 1989 and required surgery. The second occurred off the job in 1992. Robles sought treatment from Dr. David McGuire for both injuries. While treating the latter, Dr. McGuire determined that Robles was experiencing "considerable pain in both legs." On November 10, 1992, Dr. McGuire informed Providence that Robles "must have a job that requires minimum walking and standing." To meet this requirement, Dr. McGuire recommended to Providence that Robles change her occupation.

On December 21, 1992, Robles met with Providence representatives who informed her that as of that day she was removed from her job. They further informed her that she had ninety days to secure another position within the hospital or she "might be" terminated. This meeting was memorialized in a letter to Robles dated December 24, 1992.

On January 26, 1993, Robles filed a request for a reemployment benefit evaluation, based on her 1989 on-the-job knee injury, pursuant to AS 23.30.041.[1]

Providence offered Robles a temporary job in its Vocational Evaluation Program on February 12, 1993. Robles accepted the offer. Providence later said she was able to perform the sedentary non-skilled tasks assigned to her, such as filing and assembling notebooks.

Aetna, Providence's insurer, controverted Robles's claim for reemployment benefits, asserting that her current problems in both knees were a result of her 1992 non-work-related injury.

On April 8, 1993, Robles filed an application for various other workers' compensation benefits. Aetna/Providence also controverted all of these claims.

Robles was deemed eligible for reemployment benefits by a rehabilitation specialist on July 6, 1993.

On July 14, 1993, Robles was examined by Dr. Shawn Hadley at the request of Aetna/Providence. Dr. Hadley determined that Robles suffered from degenerative joint disease in both knees, a condition that Dr. Hadley said would worsen with time. Like Dr. McGuire, Dr. Hadley cleared Robles for sedentary work.

Robles met again with Providence representatives on July 29, 1993. This meeting was memorialized in a letter which informed her:

---

1. AS 23.30.041 states in part:
   (f) An employee is not eligible for reemployment benefits if
   (1) the employer offers employment within the employee's predicted post-injury physical capacities at a wage equivalent to at least the state minimum wage under AS 23.10.065 or 75 percent of the worker's gross hourly wages at the time of injury, whichever is greater, and the employment prepares the employee to be employable in other jobs that exist in the labor market. . . .

At the present time we are unable to continue your placement for task work which we have accommodated since February 1993. We have also been unsuccessful in locating a position for you based on your current skills, work experience and physical capacities. Therefore, we will not be assigning you to any other tasks effective Monday, August 2, 1993.

Robles was also notified that she had three options available to her. First, she could elect to participate in a reemployment plan. Under this option, Providence would place Robles on an "Educational Leave of Absence for up to one year." Upon completion of the reemployment plan, Robles would "be eligible to apply for transfers to available positions for which [she was] qualified." Under this option, if Robles did not complete her program in less than one year, she would be ineligible to apply for other jobs at Providence as a current employee. At the time this option was presented to Robles, Providence was undergoing a "large layoff."

Second, Robles could opt to apply for Long Term Disability (LTD). Providence explained to her that "[i]f you elect Long Term Disability please be advised that the waiting period for benefits may be six months and the usual requirement is that you are unable to work." Under this option, Robles would have no income for six months, after which time she would likely be denied the benefit since she was able to work and had been doing so until Providence ran out of "task work" for her.

It should be noted that Aetna has historically used this "unable to work" language in its LTD policies.[2] However, it is undisputed that this language cannot be applied literally.[3] Aetna has conceded that "unable to work" does not mean unable to work at any gainful employment.[4] But it is doubtful that Robles understood this distinction when making her decision of which of the three options to choose.

The third option Providence presented to Robles was early retirement. Providence informed her that "[a] review of the records indicates you are eligible at the present time. If you elect early retirement the approximate monthly benefit is $294.92." Robles chose this option.

A prehearing conference for Robles's various workers' compensation claims was held on October 21, 1993. At that conference, Robles—now unemployed/retired—added a claim for permanent total disability benefits (PTD) under AS 23.30.180.[5] Aetna/Providence controverted this claim as well.

## B. *Procedural Background*

The Alaska Workers' Compensation Board heard Robles's case on January 19, 1994 and issued an order denying all of her claims on March 21, 1994. The Board found that the "presumption of compensability attaches to [Robles's] claim for PTD benefits." Once an employee is presumed compensable, this court has found that "the law presumes that the employee remains disabled unless and

**2.** *See Ace v. Aetna Life Ins. Co.,* 139 F.3d 1241, 1244 & n. 7 (9th Cir.1998) (citing *Aetna Life Ins. Co. v. Orr,* 205 Ark. 566, 169 S.W.2d 651, 654 (1943)).

**3.** *See id.*

**4.** *See id.* at 1244.

**5.** AS 23.30.180 Permanent total disability.
(a) In case of total disability adjudged to be permanent 80 percent of the injured employee's spendable weekly wages shall be paid to the employee during the continuance of the total disability. If a permanent partial disability award has been made before a permanent total disability determination, permanent total disability benefits must be reduced by the amount of the permanent partial disability

award, adjusted for inflation, in a manner determined by the board. Loss of both hands, or both arms, or both feet, or both legs, or both eyes, or of any two of them, in the absence of conclusive proof to the contrary, constitutes permanent total disability. In all other cases permanent total disability is determined in accordance with the facts. In making this determination the market for the employee's services shall be
(1) area of residence;
(2) area of last employment;
(3) the state of residence; and
(4) the State of Alaska.
(b) Failure to achieve remunerative employability as defined in AS 23.30.041(q) does not, by itself, constitute permanent total disability.

until the employer introduces substantial evidence to the contrary."[6]

The Board further found that Aetna/Providence had come forward with substantial evidence to rebut the presumption. The evidence the Board cited was:

Dr. McGuire, her treating physician and surgeon, and Dr. Hadley [Aetna's doctor] have stated in no uncertain terms that Robles is physically capable of doing sedentary work. The only thing holding her back was the need for retraining. Further, it is undisputed that she had the physical capacity to work eight hours a day, five days a week in the employer's office from February through July 1993.

Robles appealed this decision to the superior court. Judge Andrews held that this evidence by itself was not enough to overcome the presumption of disability because, among other things, Aetna/Providence had not presented to the Board any evidence that work was available to Robles "given her physical, educational and other limitations." Judge Andrews further held:

[n]o evidence was presented that work suited to the appellant's capabilities was regularly and continuously available in the Anchorage community.

Judge Andrews's order remanding the decision to the Board used the following language: "THEREFORE IT IS ORDERED that since the Board's findings of fact are not supported by substantial evidence, the decision of the Board is REVERSED and REMANDED to the Board for further proceedings in accordance with this opinion."

On remand, the Board found that Judge Andrews's choice of language was "identical" to that employed by this court in *Vetter v. Alaska Workmen's Compensation Board. (Vetter I )*[7]

In *Vetter I*, this court reversed and remanded a case back to the Board after holding: "We thus find a lack of substantial evidence to support the finding of the Board.... We remand this case ... for further proceedings in conformity with this opinion."[8] The Board then reconsidered the issue and again ruled against Vetter. In *Vetter II*[9] this court concluded: "the Board erred in reconsidering an issue [the lack of substantial evidence] previously determined by this court...."[10]

The Board, applying the *Vetter* cases to Robles's case, stated: "In applying this test to the facts at bar, we find we are, by judicial mandate, bound to award the employee PTD benefits."

Aetna/Providence appealed this second Board decision to the superior court. Judge Murphy ruled that the Board misinterpreted Judge Andrews's order, stating that "the Board's reliance on *Vetter* is entirely misplaced." Judge Murphy held:

The difference between the *Vetter* decisions and Robles'[s] case is obvious. In *Vetter*, evidence on the issue decided by the Appellate court was obtained in the first proceeding. But in Robles'[s] case, no evidence on the existence or absence of a stable job market [for Robles] was obtained in the first proceeding. Without such evidence, the Superior Court was unable to make any ruling as to whether the evidence showed that a stable job market did or did not exist, and, in fact, did not make any such ruling.

Judge Murphy then reversed and remanded Robles's case back to the Board for another hearing to take further evidence on three issues: (1) to determine Robles's physical capabilities and educational limitations; (2) to determine what type of employment is suited to Robles's educational limitations and physical capacities; and (3) to determine if employment for Robles is regularly and continuously available to her in the Anchorage community. Judge Murphy held that only

---

**6.** *Baker v. Reed–Dowd Co.*, 836 P.2d 916, 919 (Alaska 1992)
(citing *Olson v. AIC/Martin J.V.*, 818 P.2d 669, 672 (Alaska 1991))(internal quotation marks omitted) (footnote omitted).

**7.** 524 P.2d 264 (Alaska 1974).

**8.** *Id.* at 268.

**9.** *Vetter v. Wagner*, 576 P.2d 979 (Alaska 1978) (*Vetter II* ).

**10.** *Id.* at 982.

after further evidence was taken on these issues could the Board determine if a finding of PTD for Robles was "appropriate."

Robles petitioned this court for a review of Judge Murphy's decision. We granted the petition for review and directed the parties to address three issues:

1. Did the superior court err in determining that "no evidence was presented that work suited to the appellant's capabilities was regularly and continuously available in the Anchorage community?"

2. Assuming that the superior court did not err in this determination, were the parties afforded a full and fair opportunity to litigate these issues in the original hearing?

3. Assuming that the original hearing afforded the parties a full and fair opportunity to litigate the issue, should disposition of the case be controlled by *Vetter II?*

## III. DISCUSSION

### A. Standard of Review

■ When the superior court acts as an intermediate court of appeal, no deference is given to the superior court's decision and this court will independently review the merits of an administrative determination.[11]

### B. The Superior Court Did Not Err in Determining that No Evidence Was Presented that Work Suited to Robles's Capabilities Was Regularly and Continuously Available in the Anchorage Community.

Neither of the parties argues that evidence regarding the availability of work in Anchorage for Robles was presented at the original Board hearing. In its original decision denying Robles PTD benefits the Board did not address this issue. Additionally, a review of the excerpted record of the proceedings reveals no reference to work availability for Robles. Finally, both Judge Andrews and Judge Murphy concluded that no such evidence was presented. Therefore, the superi-

or court did not err in determining that no evidence was presented regarding the availability of work for Robles.

### C. The Parties Were Afforded a Full and Fair Opportunity to Litigate these Issues in the Original Hearing.

■ This is essentially a due process issue. In determining whether due process has been observed by an administrative agency, this court reviews the proceedings:

[T]o assure that the trier of fact was an impartial tribunal, that no findings were made except on due notice and opportunity to be heard, that the procedure at the hearing was consistent with a fair trial, and that the procedure was conducted in such a way that there is an opportunity for a court to ascertain whether the applicable rules of law and procedure were observed.[12]

■ Surprisingly, Aetna/Providence chose not to brief this question (or any of this court's questions). As a result, we do not have the benefit of its position on the matter. Robles correctly contends neither party was limited in the number of witnesses they could call, nor as to the time allotted for testimony. Furthermore, there is no indication that any testimony offered by Aetna/Providence was excluded.

Aetna/Providence does not argue, nor could it, that it did not know that the availability of employment for Robles was relevant to the proceedings. This requirement is clearly outlined in AS 23.30.180, the PTD section of the Alaska Workers' Compensation Act.[13]

Therefore, Aetna/Providence was not denied a fair and full opportunity to litigate the issue of availability of employment for Robles in Anchorage because it had both notice as to the relevancy of the issue and an opportunity to litigate the issue before the Board. Aetna/Providence simply chose not to do so, and

---

**11.** *See Handley v. State, Dep't of Revenue,* 838 P.2d 1231, 1233 (Alaska 1992) (citation omitted).

**12.** *In re Hanson,* 532 P.2d 303, 305 (Alaska 1975)(footnote omitted).

**13.** *See supra* note 4.

such a choice, even if erroneous in hindsight, does not constitute a violation of due process.

#### D. *The Disposition of the Case is Controlled by Vetter II* .

■ This case is nearly identical to the *Vetter* cases. First, the Board determined that Robles, just like Vetter, was entitled to the presumption of compensable disability. Second, both Robles and Vetter were denied PTD benefits by the Board because the Board found that the employer had presented substantial evidence sufficient to overcome the presumption of compensable disability. Third, in both cases a court of appeal (the supreme court in Vetter's case, and the superior court in Robles's case) held that the Board's finding was not supported by substantial evidence. Fourth, both appellate courts reversed the Board's decision and remanded the cases back to the Board for proceedings in accordance with their rulings. In *Vetter I*, the Board incorrectly interpreted this order to mean that it should hear additional evidence. In Robles's case, the Board appropriately applied *Vetter II*. The Board determined that when an employee, such as Robles, is presumed compensable and an appellate court finds no substantial evidence supporting the Board's finding against compensability, the Board has no choice but to reverse the unsupported finding and award the benefit.

Judge Murphy attempted to distinguish the *Vetter* cases from Robles's case by noting that "no evidence was presented on the existence or absence of a stable job market" in Robles's case, unlike in the *Vetter* decisions. Judge Murphy is correct in this observation. But Judge Murphy focused on the wrong issue; no evidence was presented because Aetna/Providence *chose* not to present any. In light of that choice, or oversight, the issue then becomes: Did Judge Andrews or Judge Murphy have the authority to remand Robles's case back to the Board for further evidentiary findings? Judge Murphy held

that he had this power and it is the crux of Aetna/Providence's argument.

#### E. *Aetna/Providence's Argument*

■ Aetna/Providence correctly asserts that a superior court has the discretion to remand a case back to the Board to hear further evidence on an issue. But Aetna/Providence inappropriately relies on *Employers Commercial Union Insurance Group v. Schoen*[14] for the proposition that both Judge Andrews and Judge Murphy had the discretionary authority to remand *Robles's* case back to the Board for additional evidentiary findings. In *Schoen*, the Board denied the employer the right to cross-examine Schoen's medical expert.[15] This court held that this denial was an improper exclusion of evidence.[16] By contrast, Providence/Aetna was not denied the right to present evidence at the original hearing. Rather, it chose not to do so.

The superior court's remand language in *Schoen* was also specific in that the Board was only "to allow the requested cross-examination, and to pursue such other evidence as might be raised by the cross-examination."[17] This court held that language meant: "[T]he remand is so limited and is not intended to create an opportunity for Schoen to relitigate his claim before the Board to cure alleged defects in his proof."[18]

By seeking to present evidence on the availability of work for Robles at this late date, Aetna/Providence is asking this court for an opportunity to cure defects in its proof and thus an opportunity to relitigate its claim. It is not entitled to a second bite at the apple.

Aetna/Providence argues that
> if Ms. Robles'[s] case is to be analogized to eating fruit, Providence has not received a "second bite at the apple." Rather, [Judge Andrews] took away Providence's apple when [she] reversed the Board on the 'withdrawal from the labor market' issue. The Superior Court [Judge Murphy] then

**14.** 519 P.2d 819 (Alaska 1974).

**15.** *Id.* at 821.

**16.** *Id.* at 824.

**17.** *Id.* at 821 (footnote omitted).

**18.** *Id.* at 821 n. 1.

directed the Board to consider new evidence, such as oranges or bananas, on an issue not previously decided.

This analogy is wrong. Judge Andrews did not reverse the Board on the withdrawal from the labor market issue. Rather, she reversed the Board because Aetna/Providence did not meet its burden of coming forward with substantial evidence—specifically, the availability of work for Robles—to overcome the statutory presumption of compensability.

## IV. *CONCLUSION*

The remand order by Judge Murphy is VACATED with directions to the superior court to reinstate the Board's decision and order of November 14, 1996. Aetna/Providence is precluded from further litigation before the Board. Our holding does not foreclose Aetna/Providence's right to appeal to this court once the superior court enters its final order as directed in this opinion.