**KETCHIKAN GATEWAY BOROUGH and Insurance Company of North America, Appellants,**

v.

**Mac L. SALING and Alaska Workmen's Compensation Board, Appellees.**

No. 3820.

Supreme Court of Alaska.

Dec. 28, 1979.

---

John W. Peterson, Zeigler, Cloudy, Smith, King & Brown, Ketchikan, for appellants.

Gregory M. O'Leary, Alaska Legal Services, Anchorage, for Saling.

Ronald W. Lorensen, Asst. Atty. Gen., Avrum M. Gross, Atty. Gen., Juneau, for Workmen's Compensation Bd.

## OPINION

BURKE, Justice.

This worker's compensation case involves the question of who is liable for compensation benefits when employment with two successive employers contributes to a worker's disability. The worker in this case, Mac Saling, was employed in 1968 as a harbor master for the City of Ketchikan. On June 13, 1968, he was seriously injured when he picked up a flashlight that had been rigged with explosives.[1] The explosion "blew off his left hand at the wrist, blew a huge hole in the abdominal wall, allowing the abdominal contents to eviscerate," and caused "multiple shrapnel wounds of the chest, of the legs and the abdominal area," and injured "the right hand with deep lacerations." [2]

In October 1973, Saling returned to work. He obtained a job with Ketchikan Gateway Borough as a maintenance foreman at the airport.[3] Some time after Saling started work, he began experiencing severe pain in his right shoulder, which has been described as degeneration of the shoulder and osteoarthritis in the rotator cuff. On August 22, 1975, Saling had an accident at the job site when the brakes failed on the front-end loader he was driving. To stop the loader from going into the bay, he let the bucket down. The loader slid to the left, throwing Saling hard against the left side of the cab. The borough paid Saling compensation for his resulting temporary total disability until September 14, 1975. Saling, however, has not returned to work since this accident.[4]

1. The explosion is discussed at length in *Jordan v. State*, 481 P.2d 383, 384–85 (Alaska 1971).

2. Dr. James W. Wilson, Operation Record Ketchikan General Hospital (June 13, 1968). Saling received payments for total disability from the city's insurance carrier throughout the period for temporary total disability. On July 17, 1972, the carrier regarded Saling as permanently disabled and voluntarily commenced payment of permanent total disability compensation.

3. Saling did not inform the city's insurance carrier that he had obtained employment. Compensation payments continued through June 30, 1975, at which time the carrier learned that Saling had been working steadily for 88 weeks and stopped payments. Arrangements have been made for repayment by offsetting the amount that Saling was not entitled to receive against his future payments.

4. The parties contest the causal relationship between the loader accident and Saling's present disability. Saling also suffers a rupture of the biceps which he attributes either to the loader accident or to job-related stress. Medical testimony indicates that the biceps probably ruptured three weeks after the accident when Saling got a muscle spasm in his right arm while winding a clock or several days later while he was using a screwdriver. The exact cause of the rupture, however, is unclear and disputed on this appeal. The bicep rupture's impact on Saling's present disability is also disputed.

We do not address these factual disputes, however, because we find that Saling's employment with the borough aggravated his preexisting condition. Under the rule of liability we adopt herein, aggravation of a preexisting condition alone is sufficient to impose liability on the borough for Saling's total disability.

Saling filed compensation claims against both the borough and the city and the claims were combined for hearing before the Alaska Workmen's Compensation Board. Neither employer contested Saling's permanent total disability, but they both contested the cause of the disability and their liability for benefits. The board held the city completely responsible for Saling's compensation, finding that his 1973–1975 employment with the borough did not result in any disability. Because a computation of compensation on the basis of wages received in 1968 results in lower disability benefits than would a computation based on 1975 wages,[5] and because of an agreement with the city,[6] Saling appealed the board's decision to the superior court.[7] The superior court reversed the board and found that, because employment with the borough had aggravated Saling's preexisting injuries, the borough was solely liable for Saling's compensation benefits.

The borough has appealed, asking this court to reverse the superior court and reinstate the decision of the Alaska Workmen's Compensation Board. We affirm the result reached by the superior court.

The principal question we address in this case is who must bear the responsibility for the worker's compensation benefits when employment with successive employers contributes to the worker's disability. Before we can address this question, however, we must first consider the parties' factual dispute regarding the cause of Saling's disability.

The board's conclusion[8] that employment with the borough, the second employer, did not contribute to Saling's disability was based in part on the board's finding that Saling was permanently and totally disabled prior to his employment with the borough. The evidence the board relied on was testimony by two doctors. Dr. Shield, who had examined Saling at the city's request, testified that Saling's prior injuries were such that he should not have been working; and Dr. Wilson, Saling's personal physician, testified that prior to the loader accident he had advised Saling to stop work. Dr. Wilson also stated that he felt the job was "just too much" with Sal-

5. It is not clear from the record how the compensation benefits were computed. AS 23.30.-180, however, provides that the compensation rate for permanent total disability is 66⅔% of the injured employee's average weekly wage. The average weekly wage is calculated by dividing 52 into the total wages earned in the year, of the three calendar years *immediately preceding the injury,* which produces the highest figure. AS 23.30.220. The board found that Saling's average weekly wage was $179 in 1968 and $286.85 in 1975.

The compensation rate thus determined is then subject to the maximum rate established by the schedule set forth in AS 23.30.175, construed in *Wien Air Alaska v. Arant,* 592 P.2d 352, 356–57 n.15 (Alaska 1979).

We note that some courts which have construed similar statutory language will compute benefits on the basis of the wage in effect on the date of incapacity when that date differs from the date of injury. Annot., 86 A.L.R. 524 (1933). Other courts rigidly apply the statutory computation formula. *See, e. g., Soto v. City of Tucson,* 8 Ariz.App. 199, 445 P.2d 82, 84–85 (1968). Since the issue is not now before us, we do not address it here. Note, however, that in *Hood v. State,* 574 P.2d 811 (Alaska 1978), we held that a workman injured in 1973 was entitled to the higher benefits provided by a 1975 amendment to the Workmen's Compensation Act, which was in effect by the time his condition was rated as permanent partial disability.

6. *See* note 20 *infra.*

7. The city did not join in the appeal to the superior court and is not a formal party to this appeal. Saling, however, joined the board as a co-appellee in his appeal to the superior court, and the board has also participated as a co-appellee in the instant appeal.

8. In reviewing the board's findings of fact, the issue is whether the findings are supported by substantial evidence. *Vetter v. Alaska Workmen's Comp. Bd.,* 524 P.2d 264, 265 (Alaska 1974). Substantial evidence is such relevant evidence as a reasonable mind would accept as adequate to support a given conclusion. *Id.* at 267 n.11. The superior court applied this standard of review and concluded that the board's findings were not supported by substantial evidence. Because the superior court was sitting as an intermediate court of appeal, we review the board's findings of fact, rather than those of the superior court. *Alaska Public Util. Comm'n v. Chugach Elec. Ass'n,* 580 P.2d 687, 693 (Alaska 1978); *Jager v. State,* 537 P.2d 1100, 1106 (Alaska 1975).

ing's pain and related depression. This advice, however, went unheeded and Saling continued to work.

██ The board's reasoning misinterprets the concept of disability in Alaska worker's compensation law. The Workmen's Compensation Act defines "disability" as "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." AS 23.30.265(10). The primary consideration is not the degree of the worker's physical impairment, but rather the loss of earning capacity related to that impairment. *Vetter v. Alaska Workmen's Compensation Board,* 524 P.2d 264, 266 (Alaska 1974). In determining the extent of Saling's preexisting disability, his demonstrated earning capacity cannot be ignored. *See Hewing v. Peter Kiewit & Sons,* 586 P.2d 182, 185–86 (Alaska 1978); *Hewing v. Alaska Workmen's Compensation Board,* 512 P.2d 896, 900 (Alaska 1973). A review of the record reveals no evidence that Saling failed to perform his job duties satisfactorily. When Saling's earning capacity at the time he began work for the borough is compared with his present earning capacity, it is obvious that a change has taken place. We conclude, therefore, that the board's finding of preexisting total disability is not supported by substantial evidence.

The change in Saling's condition raises the question of whether his employment with the borough contributed to his present disability. The board found that Saling's disability was solely the result of the the normal progression of his injuries from the explosion. Implicit in this finding is the rejection of Saling's argument that employment with the borough aggravated his disability. We agree with the superior court that this finding is not supported by substantial evidence.

An important factor in Saling's present disability appears to be the degenerative changes in the right shoulder.[9] This degeneration is the cause of Saling's inability to push, pull or lift things that require any

considerable force. The motion of the right arm is also impaired to the extent that he cannot raise it to the side above seventy degrees. Dr. Wilson described the degeneration in detail at the hearing. In summary, his testimony showed that Saling's right shoulder structure has undergone chronic degeneration typified by wear and tear arthritis, bursitic symptoms, loss of tendon structure, calcium deposits, and associated loss of strength and pain. While some degeneration is apparently natural in the normal aging process, Dr. Wilson attributed Saling's condition to the additional workload borne by his right shoulder. Saling must actively use his right shoulder to operate the prosthesis he wears as a result of his first injury. Because the right shoulder is responsible for both forearms, it must work that much harder. A review of the record, however, reveals that activating the prosthesis alone would not have resulted in the degree of degeneration Saling experienced without the additional physical strain from his employment with the borough.

When Saling worked for the borough on the airport ferry system, his duties included dragging chains across the deck, an activity requiring strenuous physical exertion. He later transferred to a maintenance position at the airport where his duties included operating heavy equipment and snow removal machinery. Saling testified that he was first significantly bothered by pain in his right shoulder after he began operating this equipment. His initial visit to a doctor for treatment of the right shoulder was January 7, 1974, and since that time Saling has received periodic injections and medication for pain. In addition, Saling testified that he suffered severe discomfort on those days of heavy equipment operation, which required continuous use of his right shoulder.

Dr. Wilson repeatedly stated his opinion before the board that manual labor contributed to the degeneration:

> The situation was simply that Mac was becoming increasingly disabled because of pain. He was continuing to work but he was, from his story, really not without pain.

9. Saling's current disability includes recurrent problems with the bowels and a progression of

the hernia. These problems definitely result from the first injury alone.

Q. [Saling's attorney] Now, the work itself, would this help the condition, the manual work help the condition or would it tend to accelerate the process of deterioration?

A. No. I think that the forcing, that is, having to continue on a job that required heavy manual labor, would accelerate the rate of wear and tear in the shoulder.

On cross-examination the attorney for the borough asked, "And if I understand you correctly, it is this manipulation [to operate the prosthesis] that has contributed significantly to the degenerative process which was described?" Dr. Wilson responded, "I think that is so, yes." When pressed, Dr. Wilson explained further:

The point I would make is that we never had a complaint of pain in his left shoulder which does not, of course, is not involved with the prosthesis strap. I am sure I would guess that he had some bursitic changes like the rest of us do, off and on in that shoulder, but the accelerated changes would have started following his having to use the strap as well as the time that he then went back into heavy work. *Now, if he were using the strap, but not have to work very hard, not have to do a lot of heavy lifting and shoveling and pushing of things, then I think a slower rate of change would have been going on.* [Emphasis added.]

Two other doctors examined Saling after he began work but before the loader incident. Their reports either do not discuss causation or they assume job-related aggravation.

No evidence contradicts the statements that the problems with the shoulder were aggravated by employment for the borough. The board is entitled to disbelieve evidence and testimony, but where a decision is contrary to record evidence, we have stated that the board should describe the observation providing the basis of its disbelief. *Brown v. Northwest Airlines,* 444 P.2d 529, 533–34 (Alaska 1968). Because no such statement appears in the record, we conclude that substantial evidence does not support the board's implicit finding that there was no aggravation.

This conclusion brings us to the principal legal question in this appeal: who is liable when employment with successive employers contributes to a worker's disability? Other states have adopted variants of two views when confronted with this question. One view, the last injurious exposure rule, imposes full liability on the employer at the time of the most recent injury that bears a causal relation to the disability. 4 A. Larson, The Law of Workmen's Compensation § 95.12 (1979). The second view apportions the liability among employers according to the causal relation each injury bears to the disability. *Id.* at § 95.31. We find the last injurious exposure rule more compatible with existing Alaska law.

Saling's situation is analogous to the situation of aggravation of a preexisting non-work-related condition. In that situation we have consistently held the employer liable for the worker's entire disability.[10] The first of these cases, *Thornton v. Alaska*

10. In the first case to consider this issue, the worker had a preexisting weakness of the heart. The condition was found to have been accelerated by exertion which resulted in death from a heart attack on the job. *Thornton v. Alaska Workmen's Comp. Bd.,* 411 P.2d 209, 211 (Alaska 1966). In *Cook v. Alaska Workmen's Comp. Bd.,* 476 P.2d 29, 30–32 (Alaska 1970), the worker had suffered back and neck injuries in 1959, which were apparently aggravated when he was struck by a log in a work-related accident. The resulting condition was further presumed to be the cause of an automobile accident outside the scope of employment. In *Wilson v. Erickson,* 477 P.2d 998, 999–1000 (Alaska 1970), the worker had an arthritic condition which did not become symptomatic until a cable on the job site flipped him over. The

resulting disability was found compensable. In *Beauchamp v. Employers Liab. Assurance Corp.,* 477 P.2d 993, 995–97 (Alaska 1970), a police officer apparently had a preexisting spinal condition which was aggravated by an altercation during an arrest. His resulting disability was found compensable. In *Hawkins v. Green Assoc'd.,* 559 P.2d 118, 120 (Alaska 1977), the worker suffered from a severe spinal disease. A doctor had scheduled the worker for a spinal fusion operation but the worker cancelled the surgery when he felt better. Eighteen days later, after a fall on the job site, the worker had the surgery. This court found substantial evidence to support the board's decision to award compensation because the fall aggravated the worker's condition to the point that surgery could be postponed no longer.

*Workmen's Compensation Board,* 411 P.2d 209 (Alaska 1966), stated the rule as follows:

> It is a well established rule in workmen's compensation law that a preexisting disease or infirmity does not disqualify a claim under the work-connection requirement if the employment aggravated, accelerated, or combined with the disease or infirmity to produce the death or disability for which compensation is sought. The question in a particular case of whether the employment did so contribute to the final result is one of fact which is usually determined from medical testimony.

*Id.* at 210 (footnotes omitted). Once the employer's liability for the entire disability is established, the employer has recourse to the second injury fund, AS 23.30.205.[11] The fund, which is financed by payments made by employers of workers who suffer compensable injury resulting in permanent partial disability,[12] reimburses the employer for this additional compensation burden.

■ Extending the *Thornton* rule to govern preexisting work-related conditions would result in the adoption of the "last injurious exposure" rule. We believe that, where the preexisting condition is work-related, this rule would also operate effectively in conjunction with the second injury fund to provide a workable approach to the cumulative injury situation. We therefore extend the *Thornton* rule to the facts of

---

11. AS 23.30.205 provides in part:

> *Injury combined with preexisting impairment.* (a) If an employee who has a permanent physical impairment from any cause or origin incurs a subsequent disability by injury arising out of and in the course of his employment resulting in compensation liability for disability that is substantially greater by reason of the combined effects of the preexisting impairment and subsequent injury or by reason of the aggravation of the preexisting impairment than that which would have resulted from the subsequent injury alone, the employer or his insurance carrier shall in the first instance pay all awards of compensation provided by this chapter, but the employer or his insurance carrier shall be reimbursed from the second injury fund for all compensation payments subsequent to those payable for the first 104 weeks of disability.
>
> . . . .
>
> (c) In order to qualify under this section for reimbursement from the second injury fund, the employer must establish by written records that the employer had knowledge of the permanent physical impairment before the subsequent injury and that the employee was hired or retained in employment after the employer acquired that knowledge.
>
> (d) As used in this section, "permanent physical impairment" means any permanent condition, whether congenital or due to injury or disease, of such seriousness as to constitute a hindrance or obstacle to obtaining employment or to obtaining reemployment if the employee should become unemployed. No condition may be considered as "permanent physical impairment" unless
>
> (1) it is one of the following conditions:
>
> . . . .

> (D) arthritis,
>
> (E) amputated foot, leg, arm or hand,
>
> . . . . .
>
> (2) it would support a rating of disability of 200 weeks or more if evaluated according to standards applied in compensation claims.
>
> (e) The second injury fund may not be bound as to any question of law or fact by reason of an award or an adjudication to which it was not a party or in relation to which the commissioner of labor was not notified at least three weeks before the award or adjudication, that the fund might be subject to liability for the injury or death.
>
> (f) An employer or his carrier shall notify the commissioner of labor of any possible claim against the second injury fund as soon as practicable, but in no event later than 100 weeks after the employer or his carrier have knowledge of the injury or death.

12. The second injury fund is established by AS 23.30.040(b), which provides in part:

> (b) If an employee suffers a compensable injury which results in permanent partial disability, the employer or his insurance carrier shall, in addition to the compensation provided for, pay into the second injury fund a lump sum equal to eight per cent of the total compensation to which the employee is entitled for the permanent partial disability, as soon as the total amount of the permanent partial disability payable for the particular injury is determined by the board. . . .
> The provision of this subsection shall be waived in and during any calendar year when the unencumbered balance on January 1 in the second injury fund is equal to or exceeds the sum of $400,000.

this case.[13] Under *Thornton* Saling has the burden of establishing his compensation claim against the borough by showing that the "employment aggravated, accelerated, or combined with" his preexisting condition to produce disability. Because we find that Saling met this burden at the board hearing, we hold the borough solely liable to Saling for payment of compensation benefits. Since Saling suffered a previous permanent partial disability with the city, the city has presumably incurred some liability to the second injury fund;[14] but aside from this liability, the city has no responsibility for Saling's compensation.

For relief from part of its compensation liability, the borough should now proceed against the second injury fund pursuant to AS 23.30.205. The fund will reimburse the borough for all compensation paid to Saling after 104 weeks, if the borough can show that its liability to Saling was greater by reason of the combined effects of the preexisting condition and the subsequent work-related aggravation.[15]

We believe that last injurious exposure rule, in conjunction with the second injury fund provisions, provides a reasonably equitable approach that is easier to administer than a judicially adopted rule of apportionment. The last injurious exposure rule has the advantage of simplicity. Apportionment would require that the board calculate the amount each variable contributed to the disability. This calculation would often be difficult, if not impossible in some situations, and would require a costly and time consuming parade of expert witnesses.[16]

Before 1968 such calculations were necessary to determine an employer's liability to provide compensation because at that time liability was limited to the disability caused by the second injury. Ch. 193, § 7(6), SLA 1959. *See Alaska Workmen's Compensation Board v. H&M Logging Co.*, 492 P.2d 98, 99–100 (Alaska 1971). In 1968, however, the legislature amended AS 25.30.205. Ch. 178, § 1, SLA 1968. The employer is now responsible for providing all compensation due the worker, but the employer is to be reimbursed for any payments made after 104 weeks *without regard* to the extent the employment contributed to the disability. AS 25.30.205(a). Thus, the legislature rejected apportionment formulations in second injury fund proceedings in favor of a straightforward scheme which reflects the legislature's goals of reducing litigation and its accompanying costs. *See Employers Commercial Union Insurance Group v. Christ*, 513 P.2d 1090, 1093 (Alaska 1973). We believe these goals are promoted as well by rejecting apportionment in favor of the last injurious exposure rule in proceedings to establish the employer's liability to the worker for aggravation of a preexisting work-related injury.

 The borough maintains that strict application of the last injurious exposure rule produces a distorted result in this case. It suggests that we limit application of the rule to those cases where the last injurious exposure is the "substantial cause" in producing disability. The *Thornton* rule imposes liability whenever employ-

---

**13.** Application of the last injurious exposure rule produces the same result reached by the superior court. The superior court, however, based its conclusion on an erroneous interpretation of the second injury fund statute. The court interpreted AS 23.30.205(a) to establish an employer's liability for job-related aggravation of a preexisting condition. AS 23.30.-205(a), however, does not affect the issue of the employer's *initial* liability to the worker. It affects the *extent* of that liability *after* a compensable claim is proven. All of the parties in their briefs conceded that it was erroneous to rely upon AS 23.30.205 to determine the borough's liability to Saling.

**14.** AS 23.20.040 is set forth in note 12 *supra*.

**15.** AS 23.30.205 is set forth in note 11 *supra*.

**16.** For an extreme example of the problems of proof of apportionment, *see Anton v. Anton Interiors, Inc.*, 363 N.E.2d 1286 (Ind.App.1977). In that case the worker was denied compensation for his conceded permanent partial disability because he failed to show which of two back injuries caused the disability. Some states, however, divide the liability equally between successive employers where the extent to which each injury contributed to the disability cannot be determined. *E. g., Kidder v. Coastal Constr. Co.*, 342 A.2d 729, 734 (Me. 1975).

ment is established as a causal factor in the disability. Under principles of tort law, a causal factor is not a legal cause of an injury unless it is a substantial factor in bringing about the harm. *See Sharp v. Fairbanks North Star Borough*, 569 P.2d 178, 181–82 (Alaska 1977); *State v. Abbott*, 498 P.2d 712, 726–27 (Alaska 1972); Restatement (Second) of Torts § 431 (1965). The borough, however, appears to be arguing that employment with a second employer should not only be a legal cause but *the major cause* of disability before liability for compensation attaches. We reject this argument because we believe that requiring a worker to show the degree of disability which can be attributed to employment would create the same sort of abstruse calculation we sought to avoid by adopting the last injurious exposure rule. We therefore conclude that Saling need only have shown that employment with the borough was a legal cause of his disability, and we find that the medical testimony before the board established that it was.

We recognize, however, that some inequity is inherent in this rule. In many cases it will operate to impose a disproportionately higher burden of liability upon the last employer. The risk of this liability may ultimately discourage hiring of the partially disabled. The second injury fund, which has the primary purpose of removing obstacles to hiring the handicapped, however, is the legislature's response to this problem. *Christ*, 513 P.2d at 1093; *H&M Logging Co.*, 492 P.2d at 100. The rule will operate in those same cases to create a windfall to previous employers. Any liability imposed by the second injury fund contribution required by AS 23.30.040 [17] probably would be minimal compared to liability apportioned on the basis of causation. When considering only the interests of the successive employers, apportionment is by far the more equitable method of determining liability. But when the worker's need for a swift and inexpensive recovery is also considered, we find that the last injurious exposure rule provides the fairer approach.

We note that California has devised a scheme which combines the advantages of both methods.[18] In California, the worker may proceed against any or all of the employers whose employment of the worker contributed to the disability. The purpose of that proceeding is to establish whether the worker has a compensable disability and to determine the amount of the award. The employers may be found jointly and severally liable for compensation; but in a separate proceeding, the employers or their insurance carriers may seek apportionment or contribution against the other employers. In adopting this approach, the California Supreme Court reasoned,

> To require an employee disabled with such a disease to fix upon each of the carriers or employers the precise portion of the disability attributable to its contribution to the cause of the malady is not in consonance with the required liberal interpretation and application of the workmen's compensation laws. The successive carriers or employers should properly have the burden of adjusting the share that each should bear and that should be done by them in an independent proceeding between themselves. They are in a better position to produce evidence on the subject and establish the proper apportionment.

*Colonial Insurance Co. v. Industrial Accident Commission*, 29 Cal.2d 79, 172 P.2d 884, 886 (1946).

The superior court found the board clearly mistaken in its conclusions and awarded Saling attorney's fees in the amount of $2,624.85 for services before the board and for fees incurred on appeal to the superior court. Upon a motion to reconsider, the court modified the award to order the board on remand to consider apportionment of

17. For the text of AS 23.30.040, *see* note 12 *supra.*

18. Cal.Lab.Code § 5500.5 (West Supp.1979). While this procedure was adopted judicially in *Colonial Ins. Co. v. Indus. Accident Comm'n*, 29 Cal.2d 79, 172 P.2d 884, 886 (1946), it was not codified until 1951.

 

attorney's fees between those incurred before and after August 22, 1975, the date of the loader accident and the last day of Saling's employment, and to consider "the factual basis" for the attorney's fees. We affirm the modified order of the superior court.

The Workmen's Compensation Act provides for awards of attorney's fees to the worker in AS 23.30.145. Subsection (c) empowers the superior court to allow or increase an award of attorney's fees on review of a compensation order.[19] The subsection includes an award for fees incurred before the board. *M–B Contracting Co. v. Davis*, 399 P.2d 433, 435–36 (Alaska 1965).

We find an award of costs and attorney's fees entirely appropriate in this case. While it was uncontested that some employer would be liable for some compensation, a hearing before the board was necessary to determine the issues of causation and successive employers.[20] On December 23, 1977, when Saling requested a board hearing, he was under extreme hardship: he had been advised by his physician not to return to work, had been unable to find work, and had received no compensation since September 14, 1975. We therefore affirm the superior court's order to remand the matter of attorney's fees to the board for a determination of a reasonable fee to be apportioned between the two employers.

The decision of the superior court reversing the determination of the Alaska Workmen's Compensation Board is AFFIRMED.

---

**19.** AS 23.30.145(c) provides:

If proceedings are had for review of a compensation or medical and related benefits order before a court, the court may allow or increase an attorney's fees. The fees are in addition to compensation or medical and related benefits ordered and shall be paid as the court may direct.

**20.** The hearing was not necessary to determine the problem of repayment of benefits paid while Saling was employed. This matter was settled by the parties themselves. The city's carrier agreed to pay one-half of its liability to Saling until the overpayment was offset and until the board determined liability between the two carriers in return for Saling's agreement to pursue his claim against the borough. If the board determined that the second employer was liable, Saling also agreed to reimburse the city's carrier.