James J. RIBAR, Appellant,

v.

H & S EARTHMOVERS, Appellee.

No. 4505.

Supreme Court of Alaska.

Oct. 31, 1980.

James A. Parrish, Parrish Law Office, Fairbanks, for appellant.

Michael C. Geraghty, Merdes, Schaible, Staley & DeLisio, Inc., Fairbanks, for appellee.

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and CRASKE, Superior Court Judge.

## OPINION

MATTHEWS, Justice.

In this case, a disabled worker claims that diagnosis of a preexisting disease was delayed because symptoms of an on-the-job injury misled his attending physicians, causing them to misinterpret the significance of later symptoms of the preexisting disease. The worker claims that the portion of his disability caused by the delayed diagnosis of the preexisting disease is compensable because of the on-the-job injury's alleged causal relationship to the delayed diagnosis.

James J. Ribar was employed by H & S Earthmovers [H & S]. While at work in Fairbanks, after dark on December 12, 1975, in heavy ice fog and with the temperature at −48°, he backed a vehicle he was operating into a truck. That night, after work and while driving to Anchorage, Ribar began to feel pain in his neck. The next day he filed a report of the on-the-job injury and visited a doctor at the Fairbanks Medical and Surgical Clinic [Clinic], who diagnosed "acute cervical strain syndrone [sic] severe." Ribar was treated with physical therapy, a neck collar, and pain medication. He was not permitted to return to work and continued to report to the doctor.

At the end of December, Ribar's condition had improved, but he had still not returned to work. By January 5, 1976, his pain was more severe, and his overall condition had worsened. By January 10, he was experiencing excruciating neck pain, numbness in the upper extremities, and muscle spasms. The diagnosis of cervical strain and the method of treatment were concurred in by another Clinic physician. On January 14, Ribar was admitted to the Clinic.

Ribar's condition continued to deteriorate. By January 16, he was unable to move his arms and legs and could not sit up by himself. The Clinic physicians continued to treat him for a severe cervical strain. Finally, on January 21, he was flown to Seattle for treatment at the University of Washington Hospital. A myelogram was performed; it showed a partial blockage in the cervical region of the spine. Surgery was performed on January 22 and a tumor, which had been constricting the spinal cord, was removed. Ribar was left a quadriplegic.

Ribar sought permanent disability compensation from the Workmen's Compensation Board [Board]. The Board found that the symptoms of the tumor had not been masked by the on–the–job injury and that therefore the injury was noncompensable.[1] It is evident that the Board used the word "masked" in the narrow sense of covered, rather than in the broader sense of confused. The Board stated:

> What is at issue is whether the symptoms associated with a cervical strain "masked" the symptoms of the spinal tumor.
>
> At the hearing Dr. Mead was asked the specific question, if in his opinion the symptoms were "masked." He said "no." They may have been "confused" but they were not "masked."

The Superior Court, in affirming, agreed with the Board that masking in the sense of concealment was required, stating:

> Appellant argues, "If in fact the on–the–job injury misled claimant's physicians to his detriment, the detriment is compensable. This rule should obtain whether or not the failure to correctly diagnose the pre–existing informity [sic] might be labeled as 'malpractice' ".... However, the inquiry is not whether the physician was misled. It is whether or not the symptoms were masked.

■ H & S argues that there was substantial evidence to support the Board's conclusion that the symptoms of the preexisting disease were not, in fact, obscured or concealed by the industrial injury. Ribar does not challenge the Board's findings, but simply says they are irrelevant. Furthermore, Ribar does not claim on appeal that any actual concealment of symptoms occurred.

The issue involved is essentially a causation question, says Ribar: Was the on–the–job injury a substantial factor which contributed to his quadriplegia? He contends that the Board improperly required him to establish that the physical symptoms of his preexisting disease were obscured or concealed by the industrial injury. In fact, he says, all he needed to show was that the proper diagnosis was delayed because of the accident. H & S believes the theory advanced by Ribar, that a delayed diagnosis absent obscuring of the disease symptoms is compensable, is "wholly contrary to the policy behind workmen's compensation," inasmuch as it places the burden of the doctor's error on the employer.

The issue thus raised is a question of law. The Board rejected Ribar's theory of the case and as a result did not reach a determination regarding the facts which would control if his legal theory had been accepted.

1. The Board stated:

   15. We agree with the applicant's statement of the law that if the symptoms of applicant's cervical injury "masked" the more serious symptoms of a spinal cord compression, then the disability of the applicant is compensable. However, as previously stated, we believe the evidence indicates that the symptoms of spinal cord compression were not masked.

Ribar cites an Oregon case, *Waibel v. State Compensation Department*, 471 P.2d 826 (Or.App.1970), with remarkably similar facts in support of his legal position. In *Waibel* a worker was hit by a piece of timber, causing him to fall on his back against a log. Concussion and cervical strain were diagnosed. He returned to work with a back brace, but continued to feel back pain, and continued to visit a physician. Seven months after his on–the–job injury, a spinal tumor, resulting from Hodgkin's disease, was diagnosed. Waibel recovered compensation. The court reasoned:

> [T]he accident of August 4, 1966, and the symptoms which immediately followed it led the claimant and his attending physicians into believing that the symptoms he experienced from that time until March 11, 1967, were traumatic rather than the product of Hodgkin's disease. It seems probable that if the trauma had not "masked" the Hodgkin's disease symptoms Waibel would have received treatment for the disease at an earlier date. . . .

471 P.2d at 830.

H & S claims that *Waibel* is a case involving actual hiding of the underlying symptoms, and that it therefore cannot be read to support the broader theory of recovery suggested by Ribar. As phrased by the Oregon court, the question it faced was this:

> If the happening of an accident delays the diagnosis of a pre–existing disease with the result that the disease is not treated as promptly as it otherwise would have been, is the injured workman entitled to industrial accident compensation

for the physical consequences of the delay in treatment for the disease?

471 P.2d at 827. It is impossible to determine from the *Waibel* opinion whether the Oregon court concluded that the injury symptoms must have actually obscured the disease symptoms. It does appear, however, that Waibel exhibited symptoms indicative of the disease and inconsistent with the injury prior to the time that the correct diagnosis was made. Thus *Waibel* supports Ribar's position.[2]

We think that it makes little difference whether an industrial accident causes a delayed diagnosis of an underlying condition by actually concealing the symptoms of the condition or by merely causing confusion in the mind of the treating physician. In each case the condition is not discovered and appropriately treated because of the accident. The question in both cases is the same: was the accident a substantial factor in contributing to the applicant's condition in the sense that it delayed proper diagnosis and treatment of the tumor?[3]

■ H & S argues that acceptance of Ribar's theory will necessarily make employers liable for the consequences of medical malpractice. There are at least two problems with this argument. The first is that there is no testimony in this case that Ribar's physicians fell below the applicable standard of care owed by a doctor to his patient. A physician may be wrong in a diagnosis without being negligent. Second, even if there was negligence, the general rule is that the consequences of medical negligence committed while treating a compensable injury are themselves compensable.[4] 1 A. Larson, The Law of Workmen's

---

2. *Leaming v. State Accident Ins. Fund*, 528 P.2d 1352 (Or.App.1974) is not contrary authority, for there the fact of the industrial injury did not change the method of treating the claimant. In the present case, it is Ribar's position that his accident did cause his physicians to act differently than they would have had his accident not taken place.

3. *See Ketchikan Gateway Borough v. Saling*, 604 P.2d 590, 598 (Alaska 1979); *Cook v. Alaska Workmen's Comp. Bd.*, 476 P.2d 29, 35 (Alaska 1970).

4. The consequences of this rule are tempered somewhat by the fact that the employer is entitled to be reimbursed for compensation

Compensation § 13.21 (1978); J. Stein, Damages and Recovery § 144 (1972); W. Prosser, The Law of Torts § 44, at 278–79 (4th ed. 1971).

The evidence presented on the question whether Ribar's accident was a substantial factor in bringing about his paralysis was conflicting.[5] This case must therefore be remanded to the Board for resolution of this question.

REVERSED AND REMANDED.

BOOCHEVER, J., not participating.

___

paid for injuries caused by the negligence of a physician. AS 23.30.015.

5. Drs. Mead and Harris thought the accident caused confusion and delayed a proper diagnosis; Dr. Rogers did not agree that the cervical strain had confused the treating physicians.