William BAILEY, Jr., Appellant,

v.

LITWIN CORPORATION and Travelers
Insurance Company, Appellees.

No. S–378.

Supreme Court of Alaska.

Jan. 17, 1986.

Rehearing Granted in Part and Opinion
Amended April 7, 1986.

Chancy Croft, Anchorage, for appellant.

Kenneth P. Jacobus, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for appellees.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

This case involves a claim for workers' compensation benefits by William Bailey, Jr. After incurring a work-related injury, Bailey received temporary total disability benefits from November 1980 until July 1981. In April 1982, he received a $6000 lump-sum payment for permanent partial disability. Bailey now maintains that he was entitled to continue receiving temporary total disability compensation between July 1981 and May 1982. He also claims the Workers' Compensation Board (Board) erred in calculating his permanent partial disability award and in refusing to award him attorney's fees and costs.

### I. FACTUAL BACKGROUND

Appellant Bailey is fifty-one years old and has been a pipefitter for the last twenty-eight years. He injured his back on August 14, 1980, while leaning over a pipe to pick up a tool box and a transmitter. At the time, he was working for Appellee Litwin Corporation (Litwin), on a construction project at the Tesoro plant in Kenai, Alaska.

After his injury, Bailey was examined by several doctors and chiropractors, who formed differing assessments of his condition. In August 1980, Dr. Bruce W. Teague, a chiropractor, examined Bailey and released him for work. Bailey immediately resumed work for Litwin as a pipefitter. Dr. William West, another chiropractor, examined Bailey the following September and October and released him for regular work on September 29, 1980. Bailey was laid off November 4, 1980 when Litwin reduced its workforce. On the same day, a third chiropractor, Dr. Gene Kremer, examined Bailey and took him off work through January 1981. Dr. Michael Newman, an orthopedic specialist, treated Bailey and released him for work, without restrictions, effective April 21, 1981.[1] In April, Dr. Kremer

---

1. It should be noted, however, that Dr. Newman stated that it was his experience that if someone was sent back to the North Slope with written restrictions, they would generally not be accept- ed for work. Thus, an employer would often give the person a modified job as long as he was released without restrictions. Later, Dr. Newman stated that he thought Bailey was restricted

again took Bailey off work, but released him for work, without restrictions, as of July 6, 1981.[2]

Bailey resumed work as a hydro-tester with National–NANA on the North Slope from July 13 to August 16, 1981, when he was terminated due to a reduction in force. On October 1, 1981, he began work on the North Slope in "instrumentation"[3] for Professional Contractors, Inc. (PCI) and continued until November 4, 1981.

Christopher W.M. Horton, M.D., conducted an independent medical examination of Bailey on November 25, 1981, and recommended that Bailey continue his work without any restrictions. He evaluated Bailey as medically stationary and rated him as having a ten percent whole body permanent physical impairment.

Ross Brudenell, M.D., an orthopedic surgeon, examined Bailey on February 23, 1982, and determined that he was not medically stationary and did not release him for work. Later, Dr. Brudenell stated that Bailey's condition was medically stationary as of March 3, 1982, but that he "will probably risk increasing symptoms if he tries to do heavy, manual labor … [and that] his working activity which related to instrument controls, was much more appropriate than any attempts to try to get back his original occupation."

On March 8, 1982, Bailey returned to the North Slope to work for the F.J. Early Company, primarily in hydro-testing and instrumentation. He was terminated April 26, due to a reduction in forces, but hoped to be recalled.

Dr. Newman examined Bailey again on May 18, 1982, and considered his condition medically stationary and unchanged since April, 1981.

In sum, during the ten-month period from July 7, 1981 through May 7, 1982, Bailey worked a total of 1170 hours and earned $36,807.85 (approximately $876 per week). In 1977 his average weekly wage was also $876. In 1978 and 1979 Bailey worked approximately 1138 and 1227 hours, with average weekly wages of $517.88 and $523.68, respectively. His average weekly wage in 1980 before he was injured was $832.94.

Bailey received temporary total disability benefits from November 10, 1980, through July 6, 1981. While the payment date is unclear from the record, it is undisputed that the insurance carrier, Travelers Insurance Company (Travelers), awarded Bailey a lump sum payment of $6,000, based on a ten percent loss of earning capacity and Dr. Horton's impairment rating.

In February 1982, Bailey filed a petition for adjustment of claim with the Workers' Compensation Board. In its second decision and order,[4] the Board determined that Litwin and Travelers properly terminated Bailey's temporary total disability benefits in July 1981. The Board decided Bailey was entitled to $6000 in permanent partial disability benefits. It arrived at this figure by multiplying his ten percent loss of earning capacity by $60,000, the maximum benefits allowable under AS 23.30.190(b). Because Litwin and Travelers had already paid $6000 to Bailey voluntarily, the Board

---

in the sense that his back might hurt when he had to work with heavy equipment.

2. In a report dated February 25, 1982, Dr. Kremer qualified this release:

Initially he was released with no work restrictions on July 6, 1981. But in follow up reports after that date it was indicated that awkward bending and lifting positions would likely induce back spasms. Mr. Bailey still should not put that type of stress on his lower back nor should he in the future unless his low back weakness completely resolves. He can at this time and since 7–6–81 do "instrumentation" work which requires little more

physical effort other than standing and walking.

3. "Instrumentation" is a specialty trade within the general trade of pipefitting. It involves the fitting of small, lightweight pipes. Instrumentation accounts for approximately ten percent of all pipefitting work. Of the members in Bailey's union, about ten percent are qualified in instrumentation.

4. The original decision and order was void. The Board reconsidered the matter and issued a different decision and order on January 24, 1983.

denied Bailey's claim for costs and attorney's fees. The superior court affirmed the Board's decision and order.

## II. TEMPORARY TOTAL DISABILITY[5]

The Board found that by July 16, 1981, both Dr. Newman and Dr. Kremer had released Bailey for work without restriction, and that he had in fact returned to work on July 13. In the Board's opinion, these facts overcame any presumption that Bailey continued to be temporarily totally disabled; thus, the Board concluded that Litwin and Travelers properly terminated his temporary benefits. The Board found also that any periods of unemployment Bailey experienced between July 1981 and May 1982 were "due to the economy and construction cycles and not to the employee's injury."

Bailey argues that he is entitled to temporary total disability benefits from July 1981 through May 1982 because he was not medically stable as of July 1981, his medical condition prevented him from working full-time, and he was being retrained in instrumentation.[6]

The Alaska Workers' Compensation Act (Act), AS 23.30.005–.270, creates a presumption of compensability. AS 23.30.-120(1). If, however, substantial evidence[7] is introduced to the contrary, the presumption is rebutted and "drops out." The claimant then bears the burden of proving all elements of the claim. *Veco, Inc. v. Wolfer*, 693 P.2d 865, 870 (Alaska 1985); *Miller v. ITT Arctic Services*, 577 P.2d 1044, 1046 (Alaska 1978). The Board's written decision and order explicitly states that evidence introduced by Litwin and Travelers was sufficient to overcome the presumption. Although the Board did not expressly so state, we assume this same evidence lead it to conclude that Bailey had failed to prove the necessary elements of his claim.

In reviewing the Board's decision, our task is to determine if its findings of fact and conclusions of law are supported by "substantial evidence in light of the whole record." *Delaney v. Alaska Airlines*, 693 P.2d 859, 863 (Alaska 1985); *Beauchamp v. Employers Liability Assurance Corp.*, 477 P.2d 993, 997 (Alaska 1970). Under this standard, we may not reweigh the evidence or choose between competing reasonable inferences. *Delaney*, 693 P.2d at 863; *Beauchamp*, 477 P.2d at 997.[8] The substantial evidence test, however, is applicable "only where the Board has applied the proper legal test in reaching its findings." *Burgess Construction Co. v. Smallwood*, 623 P.2d 312, 317 (Alaska 1981) (quoting *Riddle v. Broad Crane Engineering Co.*, 53 Mich.App. 257, 218 N.W.2d 845, 846–47 (Mich.App.1974)).[9]

---

**5.** AS 23.30.185 provides:

*Compensation for Temporary Total Disability.* In case of disability total in character but temporary in quality, 66⅔ percent of the injured employee's average weekly wages shall be paid to the employee during the continuance of the disability.

A recent amendment substitutes "80 percent" for "66⅔ percent," and "spendable weekly wages" for "average weekly wages." It applies to injuries sustained on or after January 1984 only. Ch. 70, § 6, SLA 1983.

**6.** Bailey's last argument is without merit. While Bailey learned new skills in instrumentation, there is no evidence that he had undertaken an "approved vocational rehabilitation program." *Cf. Bignell v. Wise Mechanical Contractors*, 651 P.2d 1163 (Alaska 1982) (temporary benefits continue while employee is enrolled in an approved vocational rehabilitation program).

**7.** "Substantial evidence" has consistently been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Miller v. ITT Arctic Servs.*, 577 P.2d 1044, 1046 (Alaska 1978). *See also Veco, Inc. v. Wolfer*, 693 P.2d 865, 869 (Alaska 1985); *Delaney v. Alaska Airlines*, 693 P.2d 859, 862–63 (Alaska 1985).

**8.** *See also Burgess Constr. Co. v. Smallwood*, 623 P.2d 312, 317 (Alaska 1981); *Ketchikan Gateway Borough v. Saling*, 604 P.2d 590, 593 n. 8 (Alaska 1979); *Miller*, 577 P.2d at 1049; *Vetter v. Alaska Workmen's Compensation Bd.*, 524 P.2d 264, 265 (Alaska 1974).

**9.** *See also Hewing v. Alaska Workmen's Compensation Bd.*, 512 P.2d 896, 898 (Alaska 1973) (scope of review not limited to substantial evidence test where Board's decision rests on erroneous legal foundations); *Vetter*, 524 P.2d at 265 (court may consider whether an award is contrary to law).

### A. *The Test for Termination of Temporary Disability*

Bailey claims that he is entitled to additional temporary benefits after July 1981 because he was not considered medically stable until after November 1981. In concluding that his temporary benefits were properly discontinued in July 1981, the Board made no express findings of fact regarding Bailey's medical stability.[10] Our first task is to determine if the Board erred in its apparent failure to consider medical stability in deciding when temporary total benefits should cease.

The Act defines "disability" generally as "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." AS 23.30.265(10). The Alaska territorial court defined temporary total disability as "the healing period or the time during which the workman is wholly disabled and unable by reason of his injury to work." *Phillips Petroleum Co. v. Alaska Industrial Board*, 17 Alaska 658, 665 (D.Alaska 1958) (quoting *Gorman v. Atlantic Gulf & Pacific Co.*, 178 Md. 71, 12 A.2d 525, 529 (1940)). The *Phillips* court explained:

> A claimant is entitled to compensation for temporary total disability during the period of convalescence and during which time the claimant is unable to work, and the employer remains liable for total compensation until such time as the claimant is restored to the condition so far as his injury will permit. *The test is whether the claimant remains incapacitated to do work by reason of his injury, regardless of whether the injury at some time can be diagnosed as a permanent partial disability.*

17 Alaska at 666 (citations omitted) (emphasis added).

We reiterated this emphasis on earning capacity in *Vetter v. Alaska Workmen's Compensation Board*, 524 P.2d 264 (Alaska 1974), by stating:

> The concept of disability compensation rests on the premise that the primary consideration is not medical impairment as such, but rather loss of earning capacity related to that impairment. An award for compensation must be supported by a finding that the claimant suffered a compensable disability, or more precisely, a decrease in earning capacity due to a work-connected injury or illness.

524 P.2d at 266 (footnote omitted); *see also Ketchikan Gateway Borough v. Saling*, 604 P.2d 590, 594 (Alaska 1979).[11]

■ Our previous cases stress the claimant's ability to return to work and indicate that medical stability is *not* necessarily the point at which temporary disability ceases. We hold, therefore, that the Board did not err in focusing on Bailey's employment and

---

**10.** In its second decision and order, the Board stated, "We find the doctors' release and the employee's return to work overcame any presumption that the employee continued to be temporarily totally disabled...." This statement could imply that Bailey's medical condition had stabilized.

**11.** Some jurisdictions have determined that "medical stabilization or maximum physical recovery, marks the end of temporary disability." *Bignell v. Wise Mechanical Contractors*, 651 P.2d 1163, 1169 (Alaska 1982) (Rabinowitz, J., & Matthews, J., dissenting) (footnote omitted). Professor Larson concurs, observing that in most states temporary benefits cease when the "healing period" has ended and "stabilization" has occurred. 2 A. Larson, The Law of Workmen's Compensation, § 57.12 at 10–9 (1983). Professor Larson states:

> The disability period is not automatically terminated merely because claimant obtains some employment, if maximum recovery had not been achieved at the time.

*Id.* at 10–17 to 10–18 (footnote omitted). Other jurisdictions, however, view restored earning capacity, rather than medical stability, as the end of temporary disability. The California Court of Appeals stated:

> Temporary disability concerns the injured's inability to work.... Thus, an injured may be fully capable of working full time (and hence not be entitled to temporary disability) and his medical condition not yet permanent and stationary.

*Harold v. Workers' Compensation Appeals Bd.*, 100 Cal.App.3d 772, 784, 785, 161 Cal.Rptr. 508, 514 (Cal.App.1980) (citations omitted).

in failing to explicitly address the stability of his medical impairment.

### B. *Substantial Evidence in the Record*

■ The Board found that both Dr. Newman and Dr. Kremer released Bailey for work without restrictions by July 16, 1981. Even though both doctors subsequently retracted these releases, the fact that Bailey returned to work on July 13, 1981, is sufficient evidence to rebut the presumption of continuing compensability for temporary total[12] disability.

■ Bailey argues that his medical impairment prevented him from working full-time; thus, he was entitled to additional temporary compensation during the gaps in his employment between July 1981 and May 1982. The record supports the Board's finding that Bailey's periods of unemployment[13] were due to the economy and construction cycles, and not due to his disability. The pipefitting trade involves gaps in employment, and Bailey's work history prior to his injury reflects this fact. Bailey's terminations from National–NANA on August 16, 1981, and from F.J. Early Company on April 26, 1982, were both due to a reduction in force, not because of his incapacity to work.

Bailey claims the gaps in employment were due to his disability. He states that he turned down a pipeline repair job in January or February 1982 because he was physically unable to perform the work. However, while the job did involve heavy work, there were other reasons presented for Bailey's decision to not take the job, including uncomfortable working conditions, the short duration of the work, and the possibility of losing a favorable position on the union employment list. Bailey also indicated that he asked the foreman at PCI to give him a termination on a reduction in force because he did not want to continue the job when it changed from instrumentation to heavier haylon system pipe installation. However, Mr. Cable, the project superintendent for PCI, testified that Bailey was hired specifically to do instrumentation work, and he had no intention of hiring him as part of the haylon system.

■ We conclude that the Board's finding that Bailey's gaps in employment were due to the economy and construction cycles, and not the result of his physical impairment, is supported by substantial evidence in light of the whole record. Moreover, we hold that Bailey suffered no actual wage loss during the ten-month period and was, therefore, not entitled to temporary *partial* disability benefits, much less compensation for temporary *total* impairment.[14] During the ten-month period, from July 1981 to May 1982, Bailey earned an average of $876 per week. The Board applied AS 23.30.220(2)[15] and made an uncontested finding that Bailey's pre-injury average weekly wage was $859.08. Even if Bailey could have earned more if he had been able to work as a pipefitter, AS 23.30.200 does not provide for a comparison between actual post-injury wages and what

---

**12.** "Temporary disability may be total (incapable of performing *any* kind of work), or *partial* (capable of performing *some* kind of work)." *Huston v. Workers' Compensation Appeals Bd.,* 95 Cal.App.3d 856, 868, 157 Cal.Rptr. 355, 362 (Cal.App.1979) (emphasis in original).

**13.** August 16–September 30, 1981; November 4, 1981–March 8, 1982; April 26–May 27, 1982.

**14.** AS 23.30.200 provides in part:
*Temporary Partial Disability.* In case of temporary partial disability resulting in decrease of earning capacity the compensation shall be 66⅔ per cent of the difference between the injured employee's average weekly wages before the injury and his wage earning capacity after the injury in the same or another employment....
*See supra* note 5 regarding amendment to this statute.

**15.** AS 23.30.220 was repealed and reenacted in 1983. Ch. 70, § 12, SLA 1983. At the time of the Board's decision, AS 23.30.220(2) provided:
the average weekly wage is that most favorable to the employee calculated by dividing 52 into the total wages earned, including self-employment, in any one of the three calendar years immediately preceding the injury;
The Board properly used Bailey's 1977 earnings because they were higher than his earnings in 1978 or 1979.

wages would have been without the impairment.

We affirm the Board's determination that Bailey's temporary total disability benefits were properly terminated in July 1981. Even though he may not have been medically stationary, there is substantial evidence in the record that he was capable of earning wages.

## III. PERMANENT PARTIAL DISABILITY

The Board found, and the parties do not dispute, that Bailey has a "loss of earning capacity because he has a permanent impairment, [that] his post-injury earnings are less than this pre-injury average weekly wage and [that] he cannot perform all phases of pipefitting."

Litwin and Travelers voluntarily paid Bailey $6000 on April 29, 1982, as an advance on permanent partial disability. The Board determined that no further payments were due. Bailey contends that the Board incorrectly calculated loss of earning capacity and that the Board erred in limiting his benefits to $6000.

### A. *Loss of Wage Earning Capacity*

AS 23.30.190(a)(20) [16] provides that in case of an unscheduled disability, such as Bailey's back injury, compensation is 66⅔ percent of the difference between the claimant's average weekly wages and his post-injury wage-earning capacity. In determining Bailey's wage-earning capacity, the Board found that because of increases in hourly pay, and because pipefitting involves sporadic employment, Bailey's post-injury earnings were unreliable and could not be used. The Board then considered the other factors listed in AS 23.30.210 [17] and the applicable case law,[18] but still could not quantify Bailey's loss of earning capacity.

Ultimately, the Board based its determination on the average number of days Bailey worked per month in 1978 and 1979, compared with the number he worked during the ten-month period between his return to work and the Board's hearing (July 13, 1981 to May 27, 1982). The Board

**16.** AS 23.30.190 provides, in relevant part:

*Compensation for Permanent Partial Disability.*
(a) In case of disability partial in character but permanent in quality the compensation is 66⅔ per cent of the injured employee's average weekly wages ... and shall be paid to the employee as follows:
. . . .
(20) in all other cases in this class of disability the compensation is 66⅔ percent of the difference between his average weekly wages and his wage-earning capacity after the injury in the same employment or otherwise, payable during the continuance of partial disability, ... whenever the board determines that it is in the interest of justice, the liability of the employer for compensation, or any part of it as determined by the board, may be discharged by the payment of a lump sum;
(b) Total compensation paid under (a)(20) of this section may not exceed $60,000.
*See supra* note 5 regarding amendment to this statute.

**17.** AS 23.30.210 provides:

*Determination of wage-earning capacity.* In a case of partial disability under AS 23.30.190(20) or 23.30.200 the wage-earning capacity of an injured employee is determined by his actual earnings if the actual earnings fairly and reasonably represent his wage-earning capacity. If the employee has no actual earnings or his actual earnings do not fairly and reasonably represent his wage-earning capacity the board may, in the interest of justice, fix the wage earning capacity which is reasonable, having due regard to the nature of his injury, the degree of physical impairment, his usual employment, and any other factors or circumstances in the case which may affect his capacity to earn wages in his disabled condition, including the effect of disability as it may naturally extend into the future.
A recent amendment substitutes "spendable weekly wage" for "earnings" throughout the section. Ch. 70, § 9, SLA 1983.

**18.** The Board may fix wage-earning capacity by considering these factors: (1) nature of injury, (2) degree of physical impairment, (3) usual employment, and (4) other factors, including (a) age, (b) education, (c) availability of suitable employment in the community, and (d) the employee's future employment intentions, trainability, and vocational rehabilitation assessment and training. *Bignell,* 651 P.2d at 1167; *Hewing v. Peter Kiewit & Sons,* 586 P.2d 182, 186 (Alaska 1978); *Vetter,* 524 P.2d at 266; *Hewing,* 512 P.2d at 896.

found that he worked 148 days in 1978 (average of twelve days per month), 158 days in 1979 (average of thirteen days per month), and only 85 days in the preceding ten months (average of nine days per month). Thus, the difference in his wage earning capacity was three to four days per month.[19] The Board then assumed "that he could work an additional average of two to three days more per month than he has."[20] The Board concluded that Bailey misses between one and two days of work per month because of his injury—a loss of between eight and twelve percent. The Board averaged his wage earning capacity loss at ten percent.

■ While the Board's computations may not reflect *precisely* Bailey's lost earning capacity, we believe that they fairly represent his future losses. AS 23.30.210 allows the Board in the interests of justice to utilize factors other than actual earnings to fix a wage earning capacity.

We affirm the Board's calculation that Bailey's wage earning capacity is ten percent impaired for purposes of determining permanent partial disability.

## B. *Limitation on Amount of Permanent Disability Compensation*

The Board calculated Bailey's weekly benefits to be $57.27,[21] but Bailey requested a lump sum. The Board multiplied Bail-

ey's impairment of ten percent by the $60,000 limit of AS 23.30.190(b)[22] and awarded him a lump sum of $6000. In the Board's opinion, the payment of weekly benefits to Bailey up to the $60,000 limit "would produce an unreasonable result considering the minimal loss of earning capacity and minimal impairment rating." In taking this action, the Board relied on *Foster v. Wright-Schuchart-Harbor*, 644 P.2d 221 (Alaska 1982),[23] where we stated:

> In *Absher v. State, Department of Highways*, 500 P.2d 1004 (Alaska 1972), we discussed the purpose of the lump sum provision and determined that it should be used "when the use of the first part of AS 23.30.190(20) would produce an unreasonable result," i.e., a worker with an unscheduled injury would recover more than a worker with a more serious scheduled injury.

644 P.2d at 223–24.

*Absher,* is directly on point. At issue in *Absher* was the method of computing a lump sum award for an unscheduled permanent partial disability. We upheld an award of $3,400 calculated by multiplying the twenty percent loss of earning capacity by $17,000, the maximum amount payable at the time. We explained:

> While the legislature did not adopt a formula for computing lump sum payments, it may reasonably be inferred that this was left to the discretion of the

19. The Board used a five day week rather than a seven day week in making its calculations. Bailey argues that there was no evidence to support this choice. The Board's inference that Bailey worked five eight hour days per week was reasonable in light of the evidence in the record. In 1978 and 1979, Bailey worked approximately 1138 and 1227 hours, respectively. If Bailey worked seven days per week, (192 days in 1978 and 216 days in 1979) as he claims, he would only have worked an average of 5.7 to 5.9 hours per day. This contradicts Bailey's own testimony that his hours were 8:00–4:30 for at least six months in 1978, and approximately four months in 1979.

20. Bailey argues that this assumption is arbitrary and without basis. The Board supports its conclusion by the fact that Bailey has limited himself to instrumentation work even though

not all instrumentation is light. The Board concluded that if he can do all instrumentation work, he could do some pipefitting as well. The Board also found that Bailey took a hunting trip in the fall of 1981 and adjusted for this period of unemployment because it was not due to the injury.

21. The Board used the formula in AS 23.30.190(a)(20): ($859.08 × 10% × 66⅔% = $57.27).

22. *See supra* note 16.

23. In *Foster* the Board awarded a $3,000 lump sum for an unscheduled back injury by multiplying a five percent rating by $60,000. We reversed the Board's action only because the $60,000 statutory limit of AS 23.30.190(b) was not in effect at the time of Foster's injury.

board. There is no showing of an abuse of this discretion. The board's decision to base the lump sum award on the relationship between impaired earning capacity and the statutory maximum award is a reasonable one. *This method of computation is the same as that for a scheduled injury of comparable degree of impairment.*[24] In addition it avoids the unreasonable result of a disparity in awards between scheduled and unscheduled injuries.

500 P.2d at 1006 (emphasis added). However, our recent decision in *Providence Washington Insurance Co. v. Grant,* 693 P.2d 872 (Alaska 1985), places considerable doubt on the continuing viability of *Absher.*

In *Providence Washington,* the Board awarded lump sum benefits for Mr. Grant's injuries by multiplying the percentage impairments to his knee and foot by the maximum amounts allowed for a knee and foot injury under AS 23.30.190(a)(2) and (4), respectively. The board chose this method over a weekly award, which would have resulted in greater total benefits. The board based its action on *Cesar v. Alaska Workmen's Compensation Board,* 383 P.2d 805 (Alaska 1963), where we approved compensating Cesar's loss of half a thumb by multiplying the maximum allowable recovery by fifty percent impairment. In *Providence Washington* we overruled *Cesar* and stated:

> We agree that the results compelled by *Cesar* are contrary to the plain meaning of and policies behind AS 23.30.190.... The plain language of this provision does not require that the maximum amount recoverable be multiplied by the percentage impairment to the body member or function. Instead, it states the maximum amount that is recoverable under the subsection without making reference to the percentage impairment.
>
> ....

... To follow *Cesar* and require that the maximum awards be pro-rated according to the employee's percentage impairment to the body member or function does not further the policy of placing absolute limits on an employer's liability under the act.

693 P.2d at 877–78.

Under *Absher,* the Board acted reasonably in basing Bailey's lump sum award on the relationship between impaired earning capacity and the statutory maximum for unscheduled injuries. *Providence Washington,* however, forbids the identical method for scheduled injuries. The same reasons that lead us to overrule *Cesar* in the area of scheduled injuries compel us to overrule *Absher* in the case of unscheduled injuries.

The result demanded by *Absher* is "contrary to the plain meaning and policies behind AS 23.30.190." *See Providence Washington,* 693 P.2d at 877. While AS 23.30.190(a)–(20) states that a lump sum may be awarded in the "interests of justice," the "plain language of [the] provision does not require that the maximum amount recoverable be multiplied by the percentage impairment to the body member or function." *Id.* AS 23.30.190(b) states that $60,000 is the maximum recoverable under (a)(20) "without referring to the percentage impairment." *Id.* As we stated in *London v. Fairbanks Municipal Utilities,* 473 P.2d 639 (Alaska 1970):

> Where, as here, the statutory mandate is clear and would allow compensation, it is improper for the Workmen's Compensation Board to inject its own views on the policies underlying the Workmen's Compensation Act by imposing additional restrictions on the statutory language.

473 P.2d at 642.

■ Overruling *Absher* is "consistent with the policies behind the Worker's Com-

---

**24.** This statement is no longer true, according to our recent decision in *Providence Washington Ins. Co. v. Grant,* 693 P.2d 872 (Alaska 1985).

pensation Act." *See Providence Washington*, 693 P.2d at 877. By establishing a $60,000 limit on permanent partial disability for unscheduled injuries, "the legislature intended to assure employers that their liability under [AS 23.30.190(a)(20)] would never exceed [$60,000]." *Id.* To follow *Absher* and allow a maximum recovery based on percentage impairment "would not further the policy of placing absolute limits on an employer's liability under the Act." *Id.* at 878. Instead, this calculation could lead to arbitrary and inequitable results. For example, while Bailey has a minor unscheduled injury, he could very possibly lose more than $6000 in wages during the years remaining before his retirement. Inequity could also result if two employees with ten percent impairment ratings both received a lump sum payment of $6000, even though a large discrepancy exists in their pre-injury wages. This would be contrary to the statutory dictates of AS 23.30.190(a)(20) that compensation be based on the difference between the employee's average weekly wages and his wage-earning capacity after the injury.

▪ Furthermore, we now hold it to be improper for the Board to reduce the benefits of an employee with an unscheduled injury so that he will not receive more than an employee with a more serious scheduled injury, as we suggested might be reasonable in *Absher*, 500 P.2d at 1006, and in *Foster*, 644 P.2d at 224. *See London*, 473 P.2d 639, 642 (Alaska 1970) (improper for the Board to limit a partially disabled worker's recovery to the amount afforded someone totally disabled).

▪ Ordinarily, compensation is paid on unscheduled injuries according to the formula set forth in AS 23.30.190(a)(20) until the $60,000 maximum is paid. Where, as here, the employee requests a lump sum, we hold that the Board should first determine whether it is in the interest of justice that a lump sum be paid. Should that determination be made, the Board should

project the employee's total future loss, up to the $60,000 limit. The employee can then receive the present value of his total future loss in a lump sum. We reverse the Board's lump sum award of $6000 to Bailey, and remand for redetermination of whether a lump sum is in the interest of justice in this case, and if so, for recalculation of the amount in light of this opinion.

## IV. ATTORNEY'S FEES AND COSTS

The Board denied and dismissed Bailey's claim for costs and attorney's fees. Litwin and Travelers had already paid $6000 to Bailey.

The award of attorney's fees is governed by AS 23.30.145 which provides in part:

(a) ... When the board advises that a claim has been controverted, in whole or in part, the board may direct that the fees for legal services be paid by the employer or carrier in addition to compensation awarded; the fees may be allowed only on the amount of compensation controverted and awarded....

(b) If an employer fails to file timely notice of controversy or fails to pay compensation ... within 15 days after it becomes due or otherwise resists the payment of compensation ... and if the claimant has employed an attorney in the successful prosecution of the claim, the board shall make an award to reimburse the claimant for his costs in the proceedings, including a reasonable attorney fee. The award is in addition to the compensation ... ordered.

"[T]he award of the minimum statutory fees [under subsection (a)] applies only in cases where a claim has been controverted." *Haile v. Pan American World Airways*, 505 P.2d 838, 840 (Alaska 1973). An award for costs, including attorney's fees, is due under subsection (b) when the employer "resists the payment of compensation." *Id.*

Under our decision today, Bailey may be entitled to additional permanent partial disability benefits beyond those already paid by Litwin and Travelers. If so, Bailey, should receive an award for attorney's fees "on the amount of compensation controverted and awarded," AS 23.30.-145(a), and for costs in the proceedings. AS 23.30.145(b). We remand this case to the Board for a determination of attorney's fees and costs.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

MATTHEWS, Justice, joined by RABINOWITZ, Chief Justice, concurring.

I continue to believe that medical stabilization marks the end of temporary disability under the Alaska Worker's Compensation statute. *Bignell v. Wise Mechanical Contractors*, 651 P.2d 1163, 1169 (Alaska 1982) (Rabinowitz, J., with whom Matthews, J. joins, dissenting). In this case, the Board implicitly found that Bailey's medical condition had stabilized as the majority opinion has recognized. *See supra* at 252–53 n. 10. This implicit finding is supported by substantial evidence and therefore I agree that Bailey's temporary total disability payments were properly ended.

In all other respects, I concur with the majority opinion.