**William FURTICK, Petitioner,**

v.

**DISTRICT OF COLUMBIA DEPART-MENT OF EMPLOYMENT SER-VICES, Respondent.**

**Agricultural Cooperative Development International and AIG Worldsource Insurance, Intervenors.**

No. 06–AA–274.

District of Columbia Court of Appeals.

Argued March 7, 2007.

Decided April 19, 2007.

---

David M. Schloss, Washington, DC, for petitioner.

Robert J. Spagnoletti, Attorney General for the District of Columbia at the time the Statement was filed, Todd S. Kim, Solicitor General, and Edward E. Schwab, Deputy Solicitor General, filed a Statement in Lieu of Brief, for respondent.

Joseph C. Veith, Fairfax, VA, for intervenors.

Before WASHINGTON, Chief Judge, and REID and THOMPSON, Associate Judges.

REID, Associate Judge:

Petitioner William Furtick seeks review of a decision of the District of Columbia Department of Employment Services ("DOES"), Compensation Review Board ("CRB") which affirmed an Administrative Law Judge's ("ALJ") compensation order under the District of Columbia Workers' Compensation Act ("the Act" or "WCA"). Mr. Furtick challenges the conclusion of the ALJ, affirmed by the CRB, that DOES has no jurisdiction in his case because his employment at the time of his workplace injury was not principally located in the District of Columbia since his employment duties were performed while he was in Tblisi, Republic of Georgia. We affirm the agency decision.

## FACTUAL SUMMARY

The record on review shows that from the late 1980s to 1992, Mr. Furtick was employed by the United States Agency for International Development, which is headquartered in the District of Columbia, and lived in Virginia. In 1992, he began work for the Agricultural Cooperative Development International ("ACDI"), an international organization whose main office is located in the District of Columbia; he and his wife maintained their residence in Virginia. He spent years at ACDI's office in the District before accepting an assignment in Tblisi, the Republic of Georgia. On February 5, 1996, Mr. Furtick executed a Letter of Assignment, which was prepared by ACDI, and was signed and dated (January 31, 1996) by the President of ACDI. The term of the assignment was January 1, 1996 to July 31, 1997.[1] Mr. Furtick was assigned to an ACDI project funded by Save the Children. He recalled receiving the Letter of Assignment during a visit to his son in California, and signed the agreement either in California or Virginia. ACDI paid his salary by depositing a bi-weekly check into his designated bank account. His Letter of Assignment speci-

---

1. As the ALJ noted, there is no explanation as to why the starting date of the assignment began before the Letter of Assignment was executed.

fied that District of Columbia law would govern the employment agreement.

The parties stipulated that Mr. Furtick was injured in the Republic of Georgia on October 23, 1996.[2] He tried to cross a small irrigation ditch, lost his balance, fell on his right shoulder and suffered an injury. The parties also stipulated that the employer voluntarily paid Mr. Furtick temporary total disability benefits from October 24, 1996 through March 30, 2003, "and after April 1, 2004[ ] reduced its voluntary payments from the compensation rate as determined by the Act and commenced voluntary payments in the amount of $170.00 per week." Mr. Furtick and his employer further "agree[d] that the amount of reimbursement and medical bills to be paid in the event of an award are not in dispute." His initial treatment occurred in the District, but by the end of October 1997, he had changed his residence to California, to the home of his son.

After the employer's payments of disability benefits stopped, Mr. Furtick filed a claim for "causally related medical care." In its March 14, 2006 decision and order, the CRB affirmed the ALJ's February 27, 2004, determination "that there is no jurisdiction for [Mr. Furtick's] claim under the Act." Specifically, the CRB concluded that "the ALJ's finding that [Mr. Furtick] carried out all of his duties while physically located in and around Tblisi, Republic of Georgia and therefore his employment was not principally located in the District of Columbia [is] supported by substantial evidence." The ALJ declared, in part:

[T]he evidence is uncontradicted that the contract provided that [Mr. Furtick] perform all of his employment duties in the Georgian Republic, and that he had been so performing the contract exclusively in Georgia for approximately ten months when he was injured, with no intervening visits to the United States during that period. Further, with the possible exception [of] some very brief administrative wrapping up duties upon his return to the United States upon the termination of the contract (necessitated by his having become incapacitated by the injury), [Mr. Furtick] spent no time and expended no efforts on Employer's behalf in the District of Columbia, or elsewhere.

## ANALYSIS

■ Mr. Furtick contends that the Council of the District of Columbia "did not intend to preclude District of Columbia jurisdiction under the[ ] circumstances" here where (1) his "employment with ACDI had a 'legitimate relationship' with the District of Columbia"; (2) "[h]is employer . . . [, who] was based in the District, drafted and executed [his] employment contract [ ] in the District, and included in that contract a District of Columbia choice of law provision"; (3) his "employment relationship had more significant ties to the District than any other U.S. jurisdiction"; and (4) "there has

2. This stipulation is inconsistent with Mr. Furtick's responses to ACDI's first set of interrogatories. He stated that he was sent to the Republic of Georgia in 1997, was injured, returned to the District and moved to California in October 1997. During his February 10, 2004, testimony at his compensation hearing, he indicated that he first went to the Republic of Georgia to work in 1995, on a prior contract. ACDI's exhibits, presented to the ALJ, reveal prior assignment documents, one dated June 5, 1994, providing for an assignment in the Republic of Georgia to begin "on or about April 25 [no year included] [and to] terminate on 30/9/95"; and another, a November 1, 1995 Letter of Assignment Modification, specifying a new assignment to begin on November 1, 1995 and to end on December 31, 1995.

been no showing that [he] has any remedy whatsoever under the laws of the Republic of Georgia or elsewhere." He relies mainly on *Gustafson v. International Progress Enterprises,* 266 U.S.App.D.C. 25, 832 F.2d 637 (1987) to support his contention.

ACDI maintains that reliance on *Gustafson* is misplaced because that case was based upon a predecessor federal act which allowed claims for "the injury or death of an employee of an employer carrying on any employment in the District of Columbia irrespective of the place where the injury or death occurs," D.C.Code § 36–501 (1973); and that when the Act was enacted in 1979, the Council intentionally changed that provision to provide coverage in the event of injury or death outside the District only if the "employment is localized principally in the District of Columbia," D.C.Code § 36–303(a)(2) (1981), recodified at D.C.Code § 32–1503(a)(2) (2001).

 We defer to an agency's decision "so long as [it] is supported by substantial evidence." *Washington Post v. District of Columbia Dep't of Employment Servs.,* 853 A.2d 704, 706 (D.C.2004) (citation omitted). "Substantial evidence means evidence that a reasonable person would consider adequate to support a conclusion." *Id.* (citing *Dell v. District of Columbia Dep't of Employment Servs.,* 499 A.2d 102, 108 (D.C.1985)). We also defer to "an agency's interpretation of a statute it administers unless that interpretation is unreasonable in light of prevailing law." *Washington Metro. Area Transit Auth. v. District of Columbia Dep't of Employment Servs.,* 515 A.2d 740, 741 (D.C.1986) (citations omitted); *see also Hughes v. District of Columbia Dep't of Employment Servs.,* 498 A.2d 567, 570 (D.C.1985) ("Particularly where there is broad delegation of authority to an administrative agency, we must

give deference to a reasonable construction of the regulatory statute made by the agency.") (citations omitted). "Indeed, we must sustain the agency's interpretation even if a petitioner advances another reasonable interpretation of the statute or if we might have been persuaded by the alternate interpretation had we been construing the statute in the first instance." *Smith v. District of Columbia Dep't of Employment Servs.,* 548 A.2d 95, 97 (D.C. 1988).

The basic threshold issue in this case is whether the agency had subject matter jurisdiction over Mr. Furtick's claim, or to state the issue in another way, whether the WCA applies to Mr. Furtick's claim. This issue is distinct from whether the presumption of compensability (or presumption of coverage), which is explicitly set forth in the WCA, should apply in this case. We do not get to the issue of whether the presumption of compensability should apply until we first determine that the agency has jurisdiction over the claim. As the District of Columbia Circuit observed in resolving a matter under the LHWCA, "the presumption of coverage is not * * * particularly helpful in determining where the line should be drawn between employment covered by the LHWCA and employment not so covered. . . . [O]nce the line has been drawn, the presumption come(s) into play in ruling on cases near the border." *Director, Office of Workers' Comp. Programs v. National Van Lines, Inc.,* 198 U.S.App. D.C. 239, 247, 613 F.2d 972, 980 (1979) (citing *Pittston Stevedoring Corp. v. Dellaventura,* 544 F.2d 35, 48 (2d Cir.1976)) (internal quotation marks omitted). We first place the jurisdictional issue in its historical context in an effort to determine whether there is jurisdiction in Mr. Furtick's case.

The early (1928) version of the WCA incorporated the provisions of the Long-

shoremen's and Harbor Workers' Compensation Act, specifying that:

> The provisions of chapter 18 of title 33, U.S.Code, including all amendments that may hereafter be made thereto, shall apply in respect to the injury or death of an employee of an employer carrying on any employment in the District of Columbia, irrespective of the place where the injury or death occurs; except that in applying such provisions the term "employer" shall be held to mean every person carrying on any employment in the District of Columbia, and the term "employee" shall be held to mean every employee of any such person.

D.C.Code § 36–501 (1973). The Supreme Court determined in *Cardillo v. Liberty Mut. Ins. Co.*, 330 U.S. 469, 67 S.Ct. 801, 91 L.Ed. 1028 (1947) that:

> [T]he District's legitimate interest in providing adequate workmen's compensation measures for its residents does not turn on the fortuitous circumstance of the place of their work or injury. Nor does it vary with the amount or percentage of work performed within the District. Rather it depends upon some substantial connection between the District and the particular employee-employer relationship....

*Id.* at 476, 67 S.Ct. 801. *See also Pfister v. Director, Office of Workers' Comp. Programs,* 219 U.S.App.D.C. 89, 90, 675 F.2d 1314, 1315 (1982). Thus, the place of injury or death generally was irrelevant to a consideration of jurisdiction under the 1928 WCA, but a claimant had to establish a substantial connection between the District and his or her employment relationship.

The burden on a claimant to establish the "substantial connection" under the 1928 WCA was not particularly onerous. *Gustafson, supra,* pertained to a claim by the widow of an employee who died in 1978 while working in Saudi Arabia for a Saudi Arabian construction company which had an office in the District of Columbia. The employee lived in Virginia prior to traveling to Saudi Arabia, and executed his contract in Virginia. Nevertheless, the court determined that the Administrative Law Judge and the Benefits Review Board erred by deciding that they did not have jurisdiction over the widow's claim. The court reiterated an earlier decision which declared that the 1928 WCA "is of widest permissible extraterritorial application." 266 U.S.App.D.C. at 28, 832 F.2d at 640 (quoting *National Van Lines, Inc., supra,* 198 U.S.App.D.C. at 246, 613 F.2d at 979, 980). Therefore, because the "foreign enterprise deliberately set[ ] up shop [in the District of Columbia] to recruit metropolitan Washington area workers," and "solicited [Mr.] Gustafson's services through District of Columbia facilities and used those facilities to obtain personnel and material essential to its business[,] ... the employment relationship [the foreign enterprise] formed with [Mr.] Gustafson [was] legitimately and substantially tied to this nation and the District." 266 U.S.App.D.C. at 29, 832 F.2d at 641 (footnote omitted). *See also Edgerton v. Washington Metro. Area Transit Auth.,* 288 U.S.App.D.C. 191, 194, 925 F.2d 422, 425 (1991) (determining that the 1928 WCA applied to a claim where the majority of the claimant's employment contacts were in Virginia; he lived in Virginia and was injured in Virginia; he may have driven into the District frequently while working; and his employer (WMATA) had a "substantial business presence in the District"). However, the court concluded that the 1928 WCA did not apply to a claim where the employer, a mechanic, was hired in Virginia and worked there for an airlines based in Georgia, was injured in Virginia, paid income taxes in Virginia, and "there was no concern that [the claimant] would

become a public charge of the District"; the fact that the employer sold airline tickets in the District was an insufficient indicia of a substantial connection with the District since the airlines employed no mechanics in the District. *Pfister, supra,* 219 U.S.App.D.C. at 91, 675 F.2d at 1316.

The significant historical break with the 1928 WCA came in 1979 when the Council of the District of Columbia enacted the WCA of 1979 (effective in 1982) which "replaced The Longshoreman's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901 *et seq.* as the statutory basis for workers' compensation in the District of Columbia." *Hughes,* 498 A.2d at 569 (citing *District of Columbia v. Greater Washington Cent. Labor Council, AFL–CIO,* 442 A.2d 110 (D.C.1982)). *Hughes* interpreted the earlier version of the jurisdictional statutory provision which is at issue in the case before us, D.C.Code § 36–303(a) (1981):

> This chapter shall apply in respect to the injury or death of an employee of an employer ..., irrespective of the place where the injury or death occurs provided that at the time of such injury or death this employment is principally localized in the District of Columbia....

The current version of this provision, D.C.Code § 32–1503(a)(2), reads:

> (a) Except as provided in subsections (a–1) through (a–3) of this section, this chapter shall apply to:

> ....

> (2) The injury or death of an employee that occurs outside the District of Columbia if, at the time of the injury or death, the employment is localized principally in the District of Columbia.

*Hughes* explains why the Council retreated from the 1928 statutory provision requiring coverage of any employee of an employer who "carried on any employment in the District of Columbia:"

> The Council of the District of Columbia [ ] was of the view that coverage and compensation under the prior law was unduly broad and generous. *See* Council of the District of Columbia, Report of the Committee on Housing and Economic Development, Bill 3–106 (Jan. 29, 1980).... The Supreme Court had construed this statute as giving the widest extraterritorial application coverage possible consistent with the Due Process Clause of the Constitution.... [A]s a result of amendments to LHWCA in 1972, the amount of compensation awarded [under the WCA] increased markedly in the District of Columbia with a concomitant increase in insurance rates. In the view of the Council this placed the District of Columbia in a noncompetitive situation with Maryland and Virginia in keeping or attracting businesses.

*Id.* at 569–70 (other citations omitted).[3] Because of these economic reasons, the

3. Bill 3–106, District of Columbia Workers' Compensation Act of 1979 was considered and reported on by two committees of the Council of the District of Columbia, the Committee on Public Services and Consumer Affairs (January 16, 1980), and the Committee on Housing and Economic Development (January 29, 1980). The Housing and Economic Development Committee adopted an amendment in the nature of a substitute bill which was discussed in its report ("Committee Report") and ultimately was enacted as the 1979

WCA. The Committee Report contains the following language which "highlights certain significant differences" between the LHWCA and the District's WCA:

> Under the Act [LHWCA], coverage is broadly defined to include any employee of an employer carrying on any employment in the District. This all inclusive delineation of coverage plus the courts' very liberal interpretation of the Act (*Great American Indemnity Co. v. Britton,* 186 F.Supp. 938 (1960)) has led to claims being filed in the

Council shifted to a concept of jurisdiction based on "employment principally localized" (now "localized principally") in the District of Columbia; and in *Hughes,* we affirmed the agency's decision that employment was not primarily localized in the District where the employee "worked approximately 60% to 70% of his time in Virginia although he worked in the District of Columbia and Maryland at times." *Id.* at 568. Thus, for jurisdictional purposes, the WCA no longer had "the widest extraterritorial application coverage possible consistent with the Due Process Clause of the Constitution," *id.* at 569, but reached only those claims where the employment was localized principally in the District. To assist in determining whether employment was principally localized in the District, the Director of DOES adopted a test based on the Model Compensation Act. The test, which we concluded was reasonable, required a focus on:

1) The place(s) of the employer's business office(s) or facility(ies) at which or from which the employee performs the principal service(s) for which he was hired; or

2) If there is no such office or facility at which the employee works, the employee's residence, the place where the contract is made and the place of performance; or

3) If neither (1) nor (2) is applicable, the employee's base of operations.

*Id.* at 569.

We re-visited the Director's test for ascertaining whether employment is principally localized in the District in *Petrilli v. District of Columbia Dep't of Employment*

District where there is only the most tenuous connection between the employee and the city. Under Bill 3–106, coverage would be for an employee whose employment is principally localized in the District.
Committee Report at 9–10. The section-by-section analysis of the bill stated, in part, with

*Servs.,* 509 A.2d 629 (D.C.1986). We regarded the "employment relationship" as "a set of substantial and legitimate contacts between the employment and the District." *Id.* at 632 (footnote omitted). We said that: "Analysis of the work relationship permits the agency to examine significant contacts besides work activity in the District to deem whether contacts with the District are more substantial than those involving other jurisdictions." *Id.* at 632 n. 5. Significantly, we declared:

> [I]t is unnecessary to hold that the [Director's] three-part test ... should have universal application in all cases. It is enough to say that the term "employment principally localized in the District" requires a showing that a claimant's employment relationship with this jurisdiction must have contacts more substantial here than in any other place. This limit on statutory coverage is consistent with the meaning of the term "principally localized" for such words plainly contemplate the kind of employment which is primarily or predominately performed in the District.

*Id.* at 633. We applied this refined legal principle to Ms. Petrilli's situation and agreed with the Director of DOES that "her employment was not principally localized here because [the] contacts with the District were less substantial than those with another jurisdiction" since she resided in Maryland and worked for a Maryland employer as an extra salesdriver; her employment contract was executed outside the District; her employment took place in Maryland for 101 out of 109 days and

reference to the "principally localized" provision:
> [C]overage under the bill is limited to instances where there is a legitimate relationship between the employment of the injured worker, and the District of Columbia.

*Id.* at 13.

brought her to the District on 8 out of 109 days; and Maryland was paying her compensation benefits. *Id.* at 633–34.

*Railco Multi–Constr. Co. v. Gardner*, 564 A.2d 1167 (D.C.1989) involved a claim which potentially fell under both the 1928 WCA and the 1979 WCA. A claimant who worked for Railco on the subway system under the direction of the Washington Metropolitan Transit Authority as a construction worker was exposed to noisy machinery during the time the 1928 WCA was in effect, but the injury to his hearing did not manifest itself until after the 1979 WCA became effective. Railco was a District of Columbia employer and the claimant first worked in the District and then in Virginia. His latent hearing disease did not manifest itself until he was working in Virginia, but he was first exposed to the noisy machinery in the District. Responding to a question certified to us by the United States Court of Appeals for the District of Columbia Circuit, we held that the 1979 WCA "applies unless there is no subject matter jurisdiction of a claim under that Act or other state law, in which event, to avoid depriving an injured worker of any workers' compensation coverage," the 1928 WCA would apply. *Id.* at 1168. We expressed what we deemed to be the District's legislature's concern that an injured worker have a non-judicial remedy in some jurisdiction before the agency would deny coverage under the 1979 WCA:

> [W]e conclude, that in narrowing subject matter jurisdiction under the 1979 Act to employment "principally localized" in the District of Columbia, the Council fairly assumed that an injured worker who did not meet that requirement would be "principally localized" elsewhere where coverage would be available. There is nothing to suggest that the Council intended such workers to resort to tort remedies if they were not covered by the 1979 Act, or that the Council intended to change the fundamental nature of the District's workers' compensation scheme assuring compensation for disability in an efficient and economical ma[nn]er.

*Id.* at 1174–75 (footnotes and citation omitted).

We now turn to a discussion of the applicable legal principles and the facts of the case before us in order to determine whether DOES' interpretation of its implementing law, as reflected in the decisions of the ALJ and CRB, is reasonable and whether its decision is supported by substantial evidence. *See Washington Post, supra*, 853 A.2d at 706; *Hughes, supra*, 498 A.2d at 570. While ACDI's main office was located in the District of Columbia at the time of Mr. Furtick's employment, its business was internationally oriented and apparently geared toward staffing projects in other parts of the world. Its relationship with the District was a matter of convenience. As an employee of ACDI, Mr. Furtick's employment clearly had substantially more ties to the Republic of Georgia than the District. He performed the principal service for which he was hired in the Republic of Georgia, and his base of operations was Tblisi, the Republic of Georgia. His personal ties during his employment with ACDI were more significant in Virginia where he and his wife maintained their home, and later, in California where he resided with his son. Indeed, he did not execute his employment contract in the District; that was done either in California or in Virginia. Upon his return from the Republic of Georgia in October 1997, he could have filed for workers' compensation benefits in California where he resided, but he reportedly filed in the District because of better benefits.

Simply put, Mr. Furtick's employment did not have substantial and legitimate

contacts with the District. *Petrilli, supra,* 509 A.2d at 632. Nor did he have "significant contacts besides work activity in the District." *Id.* at 633 n. 5. Hence, under the *Hughes* articulation of the applicable test, his employment was not "principally localized" in the District. Under *Petrilli's* focus on the employment relationship and whether that relationship has "contacts more substantial here than in any other place," 509 A.2d at 633. Mr. Furtick's contacts were more substantial with the Republic of Georgia (place of work), Virginia and California (places of residence) than with the District during his assignments from 1995 to 1997, and after his return from the Republic of Georgia due to his injury.

Given our analysis, the ALJ's compensation order, affirmed by the CRB, reflects a reasonable interpretation of DOES' governing statute, correctly reads the *Gustafson* decision construing the LHWCA as well as our decision in *Hughes,* and its factual findings are supported by substantial record evidence. Consequently, we must defer to the agency's decision, even if Mr. Furtick has "advance[d] another reasonable interpretation of the [WCA] or [even] if we might have been persuaded by the alternate interpretation had we been construing the statute in the first instance." *Smith, supra,* 548 A.2d at 97; *Washington Post, supra,* 853 A.2d at 706.

Accordingly, for the foregoing reasons, we affirm the agency decision.

*So ordered.*